**HOUSING AUTHORITY OF THE KAW TRIBE OF INDIANS OF OKLAHOMA,** Plaintiff–Appellant,

v.

**CITY OF PONCA CITY, a municipal corporation, Defendant–Appellee.**

No. 90–6154.

United States Court of Appeals, Tenth Circuit.

Dec. 19, 1991.

---

Linda A. Epperley (Nathan H. Young III with her on the briefs), Tahlequah, Okl., for plaintiff-appellant.

Andrew W. Lester (Laura Holmgren–Ganz with him on the briefs) of Lester, Bryant & Ganz, Enid, Okl., for defendant-appellee.

Before McKAY, Chief Judge, HOLLOWAY, Circuit Judge, and WINDER,[1] District Judge.

McKAY, Chief Judge.

The Housing Authority of the Kaw Tribe of Indians of Oklahoma (the "Kaw Housing Authority" or the "Authority") challenges the order of the United States District Court for the Western District of Oklahoma dismissing its action because it lacked standing to bring suit pursuant to 42 U.S.C. §§ 1981–1983 (1988) and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* (1988), better known as the Fair Housing Act. The action arose after a state court issued a permanent injunction prohibiting the Kaw Housing Authority from purchasing homes within the city's boundaries. This injunction came at the request of the city following a veto by the mayor of Ponca City of an Inter-local Cooperation Agreement between the city and the Kaw Housing Authority for the purchase of up to ten residences for the benefit of members of the Kaw Tribe of Oklahoma.

## I.

To provide and maintain housing for the needy, Congress enacted the Housing Act of 1937. 42 U.S.C. § 1437 (1988). Consistent with the Act's mandate, the Department of Housing and Urban Development ("HUD") has promulgated regulations for the creation of Indian housing authorities. *See* 24 C.F.R. §§ 905.101–905.950 (1990). The regulations provide that an Indian housing authority may be created by either a tribal ordinance or pursuant to state law. 24 C.F.R. §§ 125–26 (1991). Whether created by tribal ordinance or state statute, the administration of an Indian housing authority must adhere to certain rules promulgated by the federal government to qualify for available federal funds.

The State of Oklahoma enacted a statute providing for the establishment of local

---

1. Honorable David K. Winder, United States District Judge for the District of Utah, sitting by designation.

Indian housing authorities. Okla.Stat. tit. 63, § 1057 (1984).[2] The Oklahoma law grants an Indian housing authority most of the powers of any city or county housing authority in the state, including the power of eminent domain. Okla.Stat. tit. 63, § 1078 (1984). The state enactment specifically designates an Indian housing authority as a state agency. *Id.* at § 1057.

The Kaw Housing Authority was created pursuant to the Oklahoma enabling provision. With financial support from HUD, the Kaw Housing Authority operates to provide low- and moderate-income housing for members of the Kaw Tribe and other Native–Americans. In 1988, the Authority applied to HUD for additional funding for the purchase of existing homes for low-income Kaw tribal members at scattered sites in Kay County, Oklahoma. As part of the scattered site acquisition project, the Kaw Housing Authority wished to purchase ten homes in Ponca City. Because Oklahoma law precludes a housing authority from operating in an area in which another housing authority is already operating, or within the boundary of a city unless the city has adopted a resolution of consent, *see* Okla.Stat. tit 63, § 1054(f), the Kaw Housing Authority sought permission from Ponca City to purchase property within its boundaries. On December 19, 1988, the Ponca City Council approved an Interlocal Cooperative Agreement supporting the purchase by the Authority of ten homes within the city limits. Pursuant to the agreement, the Authority executed options on seven homes and paid deposits totalling $14,000. On December 21, 1988,

however, the mayor vetoed the cooperative agreement, voicing concerns that the homes might become "Indian lands" and therefore immune from the city's jurisdiction. The city council approved the veto on January 6, 1989. The city then filed an action in state court seeking a permanent injunction prohibiting the Kaw Housing Authority from purchasing land within the city. The state court issued such an injunction on April 3, 1989.

The Kaw Housing Authority brought suit in federal district court, alleging that the city's actions were racially motivated and thereby violated the Authority's constitutional rights guaranteed by sections 1981–1983 of the Civil Rights Act. The Authority also claimed that the city had violated the Fair Housing Act.

In response, the city filed a Rule 12(b)(6) motion to dismiss. It asserted that, as a political subdivision of the State of Oklahoma, the Authority possessed no federal constitutional rights which could be enforced against another political subdivision under sections 1981–1983. The motion also alleged that the Authority did not qualify as an "aggrieved person" under the Fair Housing Act. Finally, the city argued that the authority was barred from asserting these claims by the doctrine of res judicata because the claims could have been asserted in response to the city's action in state court. The district court granted the city's motion to dismiss, concluding that the Kaw Housing Authority did not have standing to sue under sections 1981–1983 or the Fair Housing Act. However, the court express-

---

2. Okla.Stat. tit. 63, § 1057 (1984) provides:

There is hereby created, with respect to each Indian tribe, band, or nation in the state, a public body corporate and politic, to function in the operating area of such Indian tribe, band, or nation to be known as the "housing authority" of said Indian tribe, band, or nation, which shall be an agency of the State of Oklahoma, possessing all powers, rights, and functions herein specified for city and county authorities created pursuant to this act: Provided that said Indian housing authority shall not transact any business nor exercise its powers hereunder until or unless the governing council of said tribe, band or nation, as the case may be, by proper resolu-

tion, declares that there is a need for an authority to function for said tribe, band, or nation.

Except as otherwise provided in this act, all the provisions of law applicable to housing authorities created for cities and counties and the commissioners of such authorities shall be applicable to Indian housing authorities and the commissioners thereof, unless a different meaning clearly appears from the context. The Chief or other governing head of an Indian tribe, band, or nation is hereby authorized to exercise all appointing and other powers with respect to an Indian housing authority that are vested by this act in the mayor of a city relating to a city housing authority.

ly stated that res judicata was not a basis for its decision.

The Authority now brings this appeal. We review a Rule 12(b)(6) dismissal for failure to state a claim under the same standard applied by the district court. We therefore must assume as true all well-pleaded facts, construing them in favor of the non-moving party. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Bryan v. Stillwater Bd. of Realtors,* 578 F.2d 1319, 1321 (10th Cir.1977).

The Authority challenges the district court's conclusion that it does not have standing to bring suit under 42 U.S.C. §§ 1981–1983. It also argues that the trial court erred when it held that the Authority was not an "aggrieved person" for purposes of bringing suit under the Fair Housing Act. Conversely, the city complains that, even if the Authority has standing to sue under these provisions, the causes of action brought in the district court are barred by principles of res judicata stemming from the city's action seeking an injunction against the Authority in state court. We address, in turn, each of the parties' claims.

## II.

■ The focus of any inquiry into standing "is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.... In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citations omitted). The constitutional limitations of standing are derived from Article III,

which limits judicial power to "cases" and "controversies." To overcome the Article III limitation on standing, often referred to as the "injury in fact" requirement, a plaintiff must at a minimum show that he or she has suffered an actual or threatened injury caused by the defendant and that a favorable judicial decision is likely to redress the injury. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982).

■ Beyond the constitutional requirements, the Supreme Court has also set forth principles of standing that limit the class of persons that may invoke the courts' powers. *See Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984); *Valley Forge Christian College,* 454 U.S. at 474–75, 102 S.Ct. at 759–60; *accord Acorn v. City of Tulsa,* 835 F.2d 735, 738 (10th Cir.1987). For example, one significant limitation is that a party must assert its own legal rights and cannot rest its claim on the interests of others. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. "Without such limitations ... the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id.* at 500, 95 S.Ct. at 2205–06. Consequently, even though the plaintiff has suffered palpable injury because some third party has been denied legal rights, the plaintiff may not generally assert the third party's rights as the basis of its claim.

## A.

■ We focus initially on the Authority's standing to sue under section 1983.[3] That

---

**3.** Section 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immuni-

ties secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

provision was enacted to vindicate rights guaranteed under the Fourteenth Amendment, *see Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968); *City of Memphis v. Greene,* 451 U.S. 100, 120, 101 S.Ct. 1584, 1596, 67 L.Ed.2d 769 (1981), which places limitations on the states in the interest of individual rights. *See Commonwealth of Pennsylvania v. Porter,* 659 F.2d 306, 314 (3rd Cir.1981) (en banc), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982). To have standing to sue under section 1983, therefore, the Authority must possess some right guaranteed by the Fourteenth Amendment. Thus, section 1983 does not provide any substantive rights at all but only creates a remedy for the violation of substantive rights guaranteed by the Constitution. *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979).

To determine whether the Kaw Housing Authority possesses a Fourteenth Amendment right, we must first review the Authority's origin. The Oklahoma enabling statute provides that an Indian Housing Authority organized under its provisions is a state agency. Moreover, HUD, the federal agency in charge of overseeing Indian housing authorities, recognizes that Indian housing authorities have state agency status. In its regulations, HUD applies the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 to those Indian housing authorities created by state statute, *see* 24 C.F.R. § 905.120 (1990), but does not confer those same benefits on Indian housing authorities established by operation of tribal powers of self-government independent of state law because those housing authorities are not considered "state agencies." That the Kaw Housing Authority is a body politic of the State of Oklahoma under both federal and state law, therefore, is beyond review.[4]

It is well established that a political subdivision may not lodge constitutional complaints against its creating state. *Williams v. Mayor and City Council of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933); *City of Newark v. New Jersey,* 262 U.S. 192, 196, 43 S.Ct. 539, 540, 67 L.Ed. 943 (1923); *City of Trenton v. New Jersey,* 262 U.S. 182, 188, 43 S.Ct. 534, 537, 67 L.Ed. 937 (1923); *City of Moore v. Atchison, Topeka & Santa Fe Ry. Co.,* 699 F.2d 507, 511 (10th Cir.1983). The city urges us to apply this same principle to a constitutional challenge brought by a political subdivision, the Kaw Housing Authority, against a fellow political subdivision, Ponca City, contending that such a challenge is tantamount to an action against the creating state.

In *City of Trenton v. New Jersey,* 262 U.S. at 188, 43 S.Ct. at 537, the Supreme Court heard a challenge of a state statute by a municipality under the Contracts Clause of the Constitution. In concluding that the municipality could not mount a constitutional challenge against a state provision regulating its conduct, the Court cited with favor Mr. Justice Moody's opinion in *Hunter v. Pittsburgh,* 207 U.S. 161, 178–79, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907), *overruled on other grounds by Kramer v. Union Free Sch. Dist. 2,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), which stated:

> The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the state within the meaning of the Federal Constitution. The state, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such proper-

---

42 U.S.C. § 1983 (1988).

**4.** The Oklahoma Housing Authorities Act defines an "authority," of which the Kaw Housing Authority is one, as "any public body corporate and politic created by this act." Okla.Stat. tit. 63, § 1054 (1984).

ty, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States.... The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it.

*City of Trenton,* 262 U.S. at 186–87, 43 S.Ct. at 536. The Court then listed a long line of precedent establishing that a municipality, as a department of the state, "remains the creature of the State exercising and holding powers and privileges subject to the sovereign will." *Id.* at 187, 43 S.Ct. at 537.

In one such case, *City of Pawhuska v. Pawhuska Oil & Gas Co.,* 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054 (1918), the Court addressed whether a state could properly withdraw a city's authority to establish municipal gas rates and transfer that power to a state commission. In concluding that the parties had not set forth a question that could be redressed under the Contracts Clause of the Constitution, the Court stated:

Thus the whole controversy is as to which of two existing agencies or arms of the state government is authorized for the time being to exercise in the public

interest a particular power, obviously governmental, subject to which the franchise confessedly was granted. In this no question under the contract clause of the Constitution of the United States is involved, but only a question of local law, the decision of which by the supreme court of the state is final.

*Id.* at 397, 39 S.Ct. at 527.[5] Precisely the same struggle over which arm of the state may act in the public interest is at issue here.

■ Simply because we are now faced with a challenge brought by a state agency against a municipality rather than a challenge by a municipality against an arm of the state or a state statute does not warrant a different outcome. The Authority's challenge of the city's action is, if only indirectly, a challenge to the legislature's grant of authority to the city to determine whether a housing authority may operate within its boundaries. It is this grant of authority by the state legislature that allowed the city to both prohibit the Kaw Housing Authority from carrying out its contracts for the purchase of seven homes within its boundaries and to obtain a permanent injunction prohibiting the Authority from purchasing any other home in the city. Since the city complied with the state legislature's prescription, its actions are sanctioned by the legislature. The Authority, as a state agency, cannot therefore void the city's actions based on an assertion of a constitutional right inherent in the agency. *See Akron Bd. of Educ. v. State Bd. of Educ.,* 490 F.2d 1285, 1298 (6th Cir.1974) (Weick, J., dissenting), *cert. de-*

---

**5.** *See also Williams v. Mayor and City Council of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator."); *Risty v. Chicago, Rock Island & Pacific Ry. Co.,* 270 U.S. 378, 390, 46 S.Ct. 236, 241, 70 L.Ed. 641 (1926) ("The power of the State and its agencies over municipal corporations within its territory is not restrained by the provisions of the Fourteenth Amendment."); *City of Newark v. New Jersey,* 262 U.S. 192, 196, 43 S.Ct. 539, 540, 67 L.Ed. 943 (1923) ("The City cannot invoke the protection of the Fourteenth Amendment

against the State. Considering the former opinions of this Court, there is no substantial federal question in the case.") (footnote omitted); *City of New Orleans v. New Orleans Water Works Co.,* 142 U.S. 79, 89, 12 S.Ct. 142, 146, 35 L.Ed. 943 (1891) ("[T]he city being a municipal corporation and the creature of the state Legislature, does not stand in a position to claim the benefit of the constitutional provision in question, since its charter can be amended, changed, or even abolished at the will of the Legislature."); *City of Moore v. Atchison, Topeka, & Santa Fe Ry. Co.,* 699 F.2d 507, 511–12 (10th Cir.1983) ("[P]olitical subdivisions of a state lack standing to challenge the validity of a state statute on Fourteenth Amendment grounds.").

*nied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *accord City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d 231, 233 (9th Cir.1980). *See also Village of Arlington Heights v. Regional Transp. Auth.,* 653 F.2d 1149, 1153 (7th Cir.1981). We thus conclude that a political subdivision of a state may not challenge the validity of an act by a fellow political subdivision under the Fourteenth Amendment unless such an action is expressly authorized by the creating state.

The city argues that because we must look at whether a political subdivision is carrying out a state or local function to determine generally whether a suit may be brought against it under section 1983, *see Garcia v. Board of Education of Socorro Consolidated School District,* 777 F.2d 1403, 1407 (10th Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986), we must also look at whether that same political subdivision is an "alter ego" of the state to establish whether another political subdivision may bring suit against it. As precedent for this argument, the city cites *Monell v. Department of Social Servs. of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1977), which held that local governmental bodies are "persons" for purposes of liability under section 1983.

■ We believe the city misinterprets the Supreme Court's holding in *Monell.* There, the Court simply held that Congress, when enacting section 1983, wished to bring local governments within the statute's ambit of liability. In *Owen v. City of Independence,* 445 U.S. 622, 646, 100 S.Ct. 1398, 1413, 63 L.Ed.2d 673 (1980), the Supreme Court observed that "by the end of the 19th century, courts regularly held that in imposing a specific duty on the municipality either in its charter or by statute, the State had impliedly withdrawn the city's immunity from liability for the nonperformance or misperformance of its obligations."

Because at the time of the enactment of section 1983 municipalities no longer shared sovereign immunity with their creating states, an agency carrying out a local function could be held liable under section 1983 without intruding on the doctrine of state immunity. *Accord Will v. Michigan Dep't. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 2310 n. 7, 105 L.Ed.2d 45 (1989). That an agency carrying out a state function rather than a local function is immune from section 1983 liability, however, is a consequence of the breadth of Eleventh Amendment coverage rather than the independence of a political subdivision from its creating state. The bifurcation between local and state functions, while important for purposes of assessing Eleventh Amendment immunity, provides no comfort to the Authority in asserting its ability to bring suit against a municipality. *Cf. Appling County v. Municipal Elec. Auth.,* 621 F.2d 1301, 1308 (5th Cir.1980), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980) ("The *Monell* decision does not call into question the principle that a city or county cannot challenge a state statute on federal Constitutional grounds.").[6]

The Kaw Housing Authority next urges that, as a tribal organization as well as a political subdivision of the state, it possesses rights protected by the civil rights laws. It cites authority holding that a corporation or other form of business or non-profit organization may bring an action under section 1983. *See, e.g., Allee v. Medrano,* 416 U.S. 802, 819 n. 13, 94 S.Ct. 2191, 2202 n. 13, 40 L.Ed.2d 566 (1974). The Authority focuses on this court's decision in *United States v. Crossland,* 642 F.2d 1113 (10th Cir.1981), where we quoted with approval the following assessment of the Kiowa Housing Authority, organized under the same state provision, from *Ware v. Richardson,* 347 F.Supp. 344, 347 (W.D.Okla. 1972):

---

**6.** We acknowledge those cases that prevented suit by a municipality under section 1983 using the rationale of *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which was later overruled by *Monell.* Under those cases, a city was prevented from bringing suit as a person

because it could not conversely be liable under section 1983 as a person. *See, e.g., City of Safety Harbor v. Birchfield,* 529 F.2d 1251, 1255 (5th Cir.1976). Our rationale, however, does not rely on such a premise.

In legal consequence, however, it operates as an arm of the Kiowa Tribe of Indians for it is completely controlled by them through their power of appointment. While it is nominally a state agency, it is statutorily freed of state control and subjected to the unfettered control of the Tribe.

*Crossland,* 642 F.2d at 1114.[7] In *Crossland,* we held that a defendant who embezzled from an Indian housing authority organized under the same Oklahoma provision as the Kaw Housing Authority was properly convicted of embezzlement and theft from an Indian tribal organization pursuant to 18 U.S.C. § 1163. We relied on the reasoning of *United States v. Logan,* 641 F.2d 860 (10th Cir.1981), which held that incorporation under state law did not preclude a for-profit entity organized under the guidelines of the Indian Financing Act and wholly owned by a tribe from being characterized as an Indian tribal organization. We asserted in *Logan* that Oklahoma law and the Indian Financing Act were not "mutually exclusive; a corporation may be organized under both." *Id.*

at 862. We applied a similar rationale in *Crossland* to an Indian Housing Authority, despite its character as a state agency.[8]

■ Though a distinction between a private entity incorporated under state law and an agency established by the state and subsequently divested of state power was not determinative for purposes of liability under 18 U.S.C. § 1163 in *Logan* and *Crossland,* we find the distinction dispositive for purposes of analyzing an entity's standing to protect its federal constitutional rights from encroachment by a political subdivision. As early as its decision in *Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat) 518, 4 L.Ed. 629 (1819), the Supreme Court has recognized that corporations for public government and for private purposes stand in differing positions to challenge action by the state. In *Woodward,* the Court held that the Constitution does not restrain the states in the regulation of their civil institutions adopted for internal government. The Court concluded, therefore, that state legislatures have power to enlarge, repeal and limit the authorities of public officers.[9] The deci-

---

**7.** The Oklahoma Supreme Court, when faced with an identical issue as the court in *Ware,* reached an opposite result. *See Housing Auth. of the Choctaw Nation v. Craytor,* 600 P.2d 314 (Okla.1979). At issue in *Craytor* was a challenge by two factions which each claimed to be the rightful commissioners of the Choctaw Nation Housing Authority. The state's highest court found the dispute to be a state, rather than a tribal, issue. The court concluded: "District Courts do have jurisdiction over the Housing Authorities, for the Authority became a public body, both corporate and politic, by virtue of the Oklahoma Housing Authority Act and by virtue of the Choctaw Nation's voluntary choosing to have a functioning Authority under the Act." *Id.* at 316.

**8.** The Authority attempts to bolster its argument by referencing the decisions in *Aboah v. Housing Auth. of the Kiowa Tribe,* 660 P.2d 625 (Okla.1983), and *Housing Auth. of the Seminole Nation v. Harjo,* 790 P.2d 1098 (Okla.1990), which found that actions brought by Indian housing authorities organized under the Oklahoma Housing Authorities Act could not bring suit for forcible entry and detainer in state court. These cases are unavailing, however, for purposes of our analysis. The absence of state jurisdiction was based not on the housing authorities' status as a tribal organization but because the land at issue was "Indian land" over which the state court had no adjudicatory juris-

diction. Admittedly, the court in *Harjo* emphasized the supervision of the federal government in a contract administered by an Indian Housing Authority. It nevertheless focused on the Mutual Help and Occupancy Agreement which a housing authority must enter into before it may participate in a program administered by HUD. That decision also made clear that the property in question was subject to the superintendence of the government. In turn, this federal superintendence aided the court's ultimate conclusion that the land at issue was "Indian land." However, the court never relied on a characterization of the status of the Indian housing authority as a tribal organization independent of state law.

**9.** Chief Justice Marshall wrote:

If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds of the college be public property, or if the state of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.

*Trustees of Dartmouth College,* 17 U.S. at 629–30.

sion's rationale was premised on the same reasoning we use today: Since political subdivisions are creatures of the state, they possess no rights independent of those expressly provided to them by the state. Hence, unless expressly granted the ability by its creating state, a political subdivision cannot assert federal constitutional rights in opposition to state action.

■ State law grants to the Kaw Tribe the authority to establish and administer the Kaw Housing Authority. This grant nonetheless is subject to limitation or extinction. Pursuant to the Oklahoma Housing Authorities Act, the Kaw Housing Authority is "an agency of the State of Oklahoma, possessing all powers, rights, and functions herein specified for city and county [housing] authorities created pursuant to this act." Okla.Stat. tit. 63, § 1057. We see no reason to imply that the state conveyed to chiefs of Indian tribes any special rights that were not conveyed to mayors or county commissioners. We therefore do not find that included within the state's grant of authority to an Indian housing authority is the ability to lodge a federal constitutional challenge to actions of the state or its other political subdivisions. Whether the Kaw Housing Authority may complete its purchases without regard to Ponca City's desires is an issue of state law which does not, of itself, confer standing upon the Authority to pursue a federal claim.

### B.

■ Though our analysis has to this point focused on the ability of the Authority to lodge a constitutional complaint against the city under section 1983, we believe a similar result is dictated for those actions brought under sections 1981 [10] and

1982.[11] Originally, sections 1981 and 1982 codified rights granted under the Thirteenth Amendment. Because of their recodification in 1870 along with the enactment of section 1983, however, courts have recognized that those rights guaranteed under these provisions are also guaranteed under the Fourteenth Amendment when state action is involved. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 722, 109 S.Ct. 2702, 2715, 105 L.Ed.2d 598 (1989); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436–37, 88 S.Ct. 2186, 2201–02, 20 L.Ed.2d 1189 (1968); *see also City of Memphis v. Greene*, 451 U.S. 100, 120, 101 S.Ct. 1584, 1596, 67 L.Ed.2d 769 (1981) (recognizing that section 1982, which covers private parties, applies beyond Fourteenth Amendment prohibition which reaches only official action). Because the dispute before us is a result of official action, we believe that, like its claim under section 1983, the Authority possesses no legitimate claim against the state under sections 1981 or 1982 that would confer standing on the Authority. The Authority presents no argument for analyzing these claims differently.

### C.

■ Despite its failure to demonstrate a federal constitutional right on which it can base a claim against another political subdivision of the State of Oklahoma, the Kaw Housing Authority nevertheless attempts to assert the rights of its participants as the basis of its action under the Civil Rights Act. *See Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). Because of its status as a body politic, we believe that the Authority's assertion of representational standing is better understood as a parens patriae action. *See, e.g., Pennsylvania v.*

---

**10.** All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (1988).

**11.** All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.
42 U.S.C. § 1982 (1988).

*Porter,* 659 F.2d 306, 314–17 (3rd Cir.1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982). Yet the Authority presents no authorization by the State of Oklahoma to represent the state's sovereign interests. The Authority, under Oklahoma law, cannot therefore sue in a representative capacity. *See Board of Educ., Sch. Dist. Number 150 v. Illinois State Bd. of Educ.,* 810 F.2d 707, 709–10 (7th Cir.), *cert. denied,* 484 U.S. 829, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987) (a political subdivision's capacity to sue is determined by state law).

### III.

We next turn to the district court's conclusion that the Authority could not maintain an action under the Fair Housing Act. Section 3613 of the Fair Housing Act provides a civil cause of action for an aggrieved person within two years of the occurrence or termination of an alleged discriminatory housing practice. 42 U.S.C. § 3613(a)(1)(A) (1991 Supp.).[12]

■ We note initially that the Authority's inability to properly assert a right under the Fourteenth Amendment is not of concern when examining the Authority's claims brought pursuant to the Fair Housing Act. In *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979), and *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the Supreme Court held that standing under the Fair Housing Act extends "to the broadest class of plaintiffs permitted by Art[icle] III." *Gladstone,* 441 U.S. at 96–97, 99 S.Ct. at 1606 (citing *Trafficante* ). Consistent with the analysis of these two Supreme Court cases, therefore, the rules of standing that barred the Authority's ability to bring suit pursuant to sections 1981–1983, are not involved here. If the Authority can demonstrate that it was genuinely injured by conduct that violated its rights under section 3604 of the Fair Housing Act, then the Authority is entitled to seek redress of that harm under section 3613. *See Gladstone,* 441 U.S. at 103 n. 9, 99 S.Ct. at 1609–10 n. 9. We believe that the Authority's economic injury from the loss of its deposits on seven homes within the city's boundaries is sufficient to confer Article III standing on the Authority. *See Barlow v. Collins,* 397 U.S. 159, 162–64, 90 S.Ct. 832, 835–36, 25 L.Ed.2d 192 (1970).

Our inquiry concerning the Authority's standing to sue does not end with the finding that the Authority is not required to demonstrate that it possesses the legal rights protected by section 3604 of the Fair Housing Act. Both *Gladstone* and *Trafficante* focused on whether the plaintiff was "aggrieved" under the requirement that only an "aggrieved person" has standing to bring suit under the Act. As appellee in the instant case, the city has focused on whether the Authority is a "person" for purposes of demonstrating that it is an "aggrieved person" under the Act.

■ The Act defines an aggrieved person as any "person" who has been or believes he or she will be injured by a discriminatory housing practice. 42 U.S.C. § 3602(i) (1991 Supp.). The Act further defines "person" as

> one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers, and fiduciaries.

42 U.S.C. § 3602(d) (1991 Supp.).

The city maintains that, as a state agency, the Authority is not a "person" for purposes of maintaining an action under the Act. It refers to the definition of "person" under Title VII of the Civil Rights Act

---

12. The section, amended in 1988, provides:
   An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.
   42 U.S.C. § 3613 (1991 Supp.).

of 1964, which includes governments, governmental agencies and political subdivisions.[13] Because those entities are absent from the definition of person in Title VIII of the Civil Rights Act of 1968, the city reasons that such entities do not have standing to bring suit pursuant to that provision.[14] This reasoning does not, however, explain why Congress would wish to exclude governmental entities from bringing suit under the Fair Housing Act. The city appears to posit the following syllogism: 1) governmental agencies do not have standing to bring suit under the Fair Housing Act; 2) the Authority is a governmental agency; therefore, 3) the Authority does not have standing to bring suit under the Fair Housing Act.

The Authority contends that, regardless of its status as a state agency, it may bring an action under the Fair Housing Act as a public "corporation," a tribal "organization," and a "trustee" of the Kaw Tribe. It urges that even if we were to read the statute to exclude government agencies, we should not exclude those agencies with such special status.

We begin with the city's premise that governmental agencies do not have standing to bring suit under the Fair Housing Act. Though the decisions in *Trafficante* and *Gladstone* focused primarily on who was an "aggrieved person" under the Act, they also provide some assistance in determining who is a "person" under the Act. As the Court in *Trafficante* recognized, "the proponents of the legislation emphasized that those who were not the direct objects of discrimination had an interest in ensuring fair housing, as they too suffered." *Trafficante*, 409 U.S. at 210, 93 S.Ct. at 367. Noting that HUD had no enforcement powers under the Act, the Court reasoned that complainants bringing suit act as private attorneys general for those whose rights have been violated.

The Fair Housing Act was amended in 1988 to confer on HUD certain enforcement powers. *See* 42 U.S.C. § 3612 (1991 Supp.).[15] The legislative history of the 1988 amendments evidences the legislature's intent that the term "aggrieved person" should be given the broad definition recognized by prior precedent. H.R.Rep. No. 100–711, 100th Cong., 2d sess., *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2184.

Indeed, comments on proposed regulations consistent with the 1988 amendments addressed concerns that the definition of "aggrieved person" be expanded to include organizations such as housing authorities. HUD responded that

the Department has determined that the definitions in these regulations which are terms defined in the Fair Housing Act should contain the statutory language. However, the Department has consistently interpreted the provisions of the fair housing law to permit the filing of a complaint by any person or organization which alleges that a discriminatory housing practice has occurred or is about to occur and which will result in an injury to them.

13. The definition reads in full:
The term "person" includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 or receivers.
42 U.S.C. § 2000e (1988).

14. In *Gladstone*, the group of plaintiffs bringing suit under the Act included a municipality. The Supreme Court, however, specifically declined to address whether a municipality is a "person" for the purpose of bringing suit under the Act:
In this Court, petitioners have not argued that the village is not a "person," contending instead that it is not a "private person." Petitioners thus have presented a variant of the question raised belatedly in the Court of Appeals and given, perhaps deservedly, only cursory treatment there. Under these circumstances, the question whether Bellwood is a "private person" entitled to sue under § 812 is not properly before us, and we express no views on it.
*Gladstone*, 441 U.S. at 109 n. 21, 99 S.Ct. at 1612–13 n. 21.

15. For an overview of the 1988 amendments, see *Secretary, United States Dep't of Hous. & Urban Dev. ex rel. Herron v. Blackwell*, 908 F.2d 864, 868–70 (11th Cir.1990).

54 F.R. 3232–01. When faced with a problem of statutory construction, an interpretation by the agency in charge of enforcing the statute is accorded great deference. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

We believe that the interpretation of "person" urged by the city would substantially thwart the goal of Congress when it enacted the Fair Housing Act. The House Report on the 1988 amendments recognized the current procedure of referring a complaint to certified state or local agencies for disposition under section 810 of the Act. *See* 42 U.S.C. § 3610(c) (1984). In particular, it "recognize[d] the valuable role state and local agencies play in the enforcement process." 1988 U.S.Code Cong. & Admin.News at 2196. Yet the interpretation urged by the city would exempt state and local agencies from bringing a civil action under the Act and thereby completely exclude from the Act's protection those agencies not "certified" by HUD. Such an action is particularly important where, as alleged in the Authority's complaint, a municipality's racial animus precludes a state housing authority from carrying out its very function.[16]

We thus do not share the city's belief that by not specifically including within the definition of "person" the terms "governments, governmental agencies and political subdivisions" Congress meant to exclude those entities from filing suit under 42 U.S.C. § 3613. It is clear that Congress intended to summon all available forces to "vindicat[e] a policy that Congress considered to be of the highest priority." *Trafficante,* 409 U.S. at 211, 93 S.Ct. at 367.

The district court erred when it found that the Authority could not bring suit as a "person" under the Fair Housing Act. We now proceed to consider another theory proposed by the city as a basis for the dismissal of this allegation.

## IV.

In addition to its other arguments, the city also contends that principles of res judicata bar the Authority's action brought pursuant to the Fair Housing Act. We note that the city lost this claim at the district court and did not cross-appeal. The city nevertheless argues that because it asserted the argument in the district court and a finding in its favor would sustain the district court's judgment, it was not required to cross-appeal. *See Colautti v. Franklin,* 439 U.S. 379, 397 n. 16, 99 S.Ct. 675, 686 n. 16, 58 L.Ed.2d 596 (1979).

■ We are not persuaded by the city's contention. An appellee may present an argument on appeal only if it does not enlarge the rights conferred by the original judgment. *Morley v. Maryland Casualty Co.,* 300 U.S. 185, 191, 57 S.Ct. 325, 327, 81 L.Ed. 593 (1937); *Emerson v. Labor Investment Corp.,* 284 F.2d 946, 948 (10th Cir.1960). *See also,* 15 Charles Wright et al., *Federal Practice and Procedure* § 3905 (1990 Supp.). Were we to affirm the original judgment on the basis of res judicata, other potential plaintiffs having some relationship with the Authority might unfairly be precluded from bringing claims against Ponca City. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

■ A decision based on res judicata would also be unfair to the Authority. Liti-

---

**16.** Though not cited by the city, we are somewhat troubled by the House Report's explanation that Section 8 of the Bill "amends title VIII by striking the provisions relating to enforcement in existing title VIII and replacing them with an administrative enforcement procedure and an improved system for civil action by *private parties* and the Attorney General." 1988 U.S.Code Cong. & Admin.News at 2194 (emphasis supplied). The analysis of the Seventh Circuit in *Village of Bellwood v. Gladstone Realtors,* 569 F.2d 1013, 1020 n. 8 (7th Cir.1978), referred

to by the Supreme Court on review, *see Gladstone Realtors,* 441 U.S. at 109 n. 21, 99 S.Ct. at 1612 n. 21, recognized that a municipality was a "person" under the Fair Housing Act. Aware of that holding, Congress did nothing to undermine the decision by amendment. Though the Seventh Circuit's reasoning is not definitive, given the broad sweep and increased enforcement contained in the Fair Housing Amendments Act of 1988, we are satisfied that Congress intended the result we reach here.

gants are entitled to a full and fair opportunity to litigate claims. *Thournir v. Meyer,* 803 F.2d 1093, 1095 (10th Cir.1986); *Scroggins v. Kansas,* 802 F.2d 1289, 1291 (10th Cir.1986). The City argues that the Authority should have been required to raise all claims before the state court that granted the permanent injunction against the Authority. However, because the record provides no indication that the Authority was given a full and fair opportunity to litigate its claims before the state court, we refuse to affirm a decision to dismiss based on res judicata grounds. *See Carter v. City of Emporia, Kansas,* 815 F.2d 617, 621 (10th Cir.1987) ("Even when the requirements of claim preclusion ... are satisfied, we will still inquire whether plaintiffs have had a full and fair opportunity to litigate their claims before a court with the authority to adjudicate the merits of those claims.") (citations omitted); *Morgan v. City of Rawlins,* 792 F.2d 975, 979 (10th Cir.1986) ("[I]f there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation, redetermination of the issues is warranted.") (citing *Montana v. United States,* 440 U.S. at 164 n. 11, 99 S.Ct. at 979 n. 11) (other citations omitted).

The Authority's claim under the Fair Housing Act is not barred by res judicata because the record does not reflect sufficient evidence that the Authority was given a full and fair opportunity to litigate that claim before the state court, and because the city failed to cross-appeal on this issue.

### Conclusion

We affirm the decision of the district court to dismiss the Authority's claims brought under sections 1981–1983. We reverse the district court's decision to dismiss the Authority's claims brought pursuant to the Fair Housing Act and remand for consideration of those claims. We further hold that res judicata does not bar the Fair Housing Act claim.