**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 7, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CITY OF HUGO, an Oklahoma municipality;
HUGO MUNICIPAL AUTHORITY, an
Oklahoma Public Water Trust for the benefit of
the City of Hugo, Oklahoma,

   Plaintiffs,

  v.

JESS MARK NICHOLS; RUDOLF JOHN
HERRMANN; ED FITE; FORD
DRUMMOND; JACK W. KEELEY;
KENNETH W. KNOWLES; LINDA
LAMBERT; LONNIE FARMER; RICHARD
SEVENOAKS, in their official capacity as
members of the Oklahoma Water Resources
Board and the Oklahoma Water Conservation
Storage Commission,

   Defendants - Appellees,
_____

CITY OF IRVING,

   Intervenor - Appellant.

No. 10-7043

---

CITY OF HUGO, an Oklahoma municipality;
HUGO MUNICIPAL AUTHORITY, an
Oklahoma Public Water Trust for the benefit of
the City of Hugo, Oklahoma,

   Plaintiffs - Appellants,

  v.

No. 10-7044

JESS MARK NICHOLS; RUDOLF JOHN HERRMANN; ED FITE; FORD DRUMMOND; JACK W. KEELEY; KENNETH W. KNOWLES; LINDA LAMBERT; LONNIE FARMER; RICHARD SEVENOAKS, in their official capacity as members of the Oklahoma Water Resources Board and the Oklahoma Water Conservation Storage Commission,

Defendants - Appellees,
_____

CITY OF IRVING,

Intervenor.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. 6:08-CV-00303-JTM)**

---

Douglas G. Caroom, Bickerstaff Heath Delgado Acosta LLP, Austin, TX (Dale E. Cottingham and Patrick R. Wyrick, GableGotwals, Oklahoma City, OK; Susan M. Maxwell, Bickerstaff Heath Delgado Acosta LLP, Austin, TX, with him on the briefs), for Intervenor-Appellant and Plaintiffs-Appellants.

Charles T. DuMars, Law & Resource Planning Associates, P.C., Albuquerque, NM (M. Daniel Weitman, Assistant Attorney General, Oklahoma Attorney General's Office, Oklahoma City, OK; Stephen Curtice, Law & Resource Planning Associates, P.C., Albuquerque, NM, with him on the briefs), for Defendants-Appellees.

---

Before **MURPHY**, **GORSUCH**, and **MATHESON**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

## I. Introduction

The City of Hugo, Oklahoma, and the Hugo Municipal Authority, a public water trust, (collectively "Hugo") have contracted with the City of Irving, Texas, ("Irving") for the sale of water Hugo has been or seeks to be allocated under permits issued by the Oklahoma Water Resources Board ("Board"). Hugo and Irving brought suit against the nine members of the Board for a declaration that certain Oklahoma laws governing the Board's water allocation decisions are unconstitutional under the dormant Commerce Clause and an injunction prohibiting their enforcement. The district court granted summary judgment for the Board, and Hugo and Irving appealed. As explained below, Hugo, a political subdivision of Oklahoma, lacks standing to sue the Board under the dormant Commerce Clause. Irving, whose injury is solely premised on a contract it entered into with Hugo, likewise cannot demonstrate standing because any injury to Irving cannot be redressed. Concluding no plaintiff has necessary standing, this court **VACATES** the district court's order and **REMANDS** the case to the district court to dismiss for lack of federal jurisdiction.

## II. Background

The Board oversees Oklahoma's permitting process for appropriating water within the state. Okla. Stat. tit. 82, § 105.9. Hugo, a longstanding holder of two permits issued by the Board, contracted to sell water to Irving for use in Texas.

In conjunction with that agreement, Hugo applied for a third permit to appropriate additional water and, later, sought to modify its two existing permits to include Irving as a place of use.[1]

Before the Board acted on its application for a third permit, Hugo filed suit seeking a declaratory judgment that certain Oklahoma laws[2] governing the permitting process are unconstitutional under the dormant Commerce Clause, and an injunction preventing the Board from applying those provisions to Hugo's applications. In essence, Hugo asserted these laws discriminate against permit

---

[1]At a minimum, the parties agree the applications to modify existing permits are still pending, although whether the application for an additional appropriation is still pending or has been "deemed withdrawn" is in dispute.

[2]Initially, the suit challenged Okla. Stat. tit. 82, § 1B, a five-year moratorium on export of water out of state; Okla. Stat. tit. 74, § 1221.A, a five year moratorium on the creation of any water compact or agreement exporting water out of state; Okla. Stat. tit. 82, § 1085.2(2), which prohibits conveying water out of state without legislative authorization; Okla. Stat. tit. 82, § 105.16(B), which exempts from a requirement that permitted water be put to beneficial use within seven years only those water permits that, inter alia, "promote the optimal beneficial use of water in the state"; and Okla. Stat. tit. § 82, § 1085.22, which prohibits permitting for the sale or resale of water for use outside Oklahoma. Thereafter, the legislature enacted reforms to the permitting process, and, separately, the five-year moratorium expired. The complaint was amended to add challenges to four of the newly enacted provisions: Okla. Stat. tit. 82, § 105.12(A)(5), which requires the Board in deciding permit applications for out-of-state water use to consider whether water can be feasibly transported to alleviate shortages within Oklahoma; Okla. Stat. tit. 82, § 105.12A(B)(1), which provides no permit for out-of-state water use can issue if it will impair the ability of Oklahoma to meet its obligations under any water compact; Okla. Stat. tit. 82, § 105.12(F), which requires review of any permit for out-of-state water use every ten years; and Okla. Stat. tit. 82, § 105.12A(D), which forbids issuing a permit for out-of-state water use without legislative approval if that water is subject to a water compact.

applications seeking to appropriate water for out-of-state use, thereby impermissibly burdening interstate commerce. Irving intervened as a plaintiff alleging the same constitutional claims. The district court granted summary judgment for the Board on the dormant Commerce Clause claim, concluding that the Red River Compact, a water compact ratified by Congress, authorized Oklahoma to enact the challenged laws. Accordingly, the district court did not reach the question whether the statutes would violate the dormant Commerce Clause absent congressional authorization. Hugo and Irving filed the instant appeal.

## III. Discussion

Under the doctrine of political subdivision standing, federal courts lack jurisdiction over certain controversies between political subdivisions and their parent states. *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998).[3] On appeal, as below, no party raised the issue whether Hugo has standing[4] to sue the Board under the dormant Commerce Clause or whether, if

---

[3]This principle applies equally to suits against state officials in their official capacity, such as the members of the Board in this case. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

[4]For those reasons set out at length by the Fifth Circuit in *Rogers v. Brockette*, 588 F.2d 1057, 1068-70 (5th Cir. 1979), there is serious reason to doubt whether "standing" in the Article III context is at issue in the *Trenton* and *Williams* line of cases. *Branson School District RE-82 v. Romer*, however, casts the matter as one of jurisdictional standing, 161 F.3d 619, 628 (10th Cir. 1998), and is binding on this panel absent an intervening contrary decision of the

(continued...)

-5-

Hugo lacks standing, Irving has standing premised on its contract with Hugo.

This court has an independent obligation to assess its own jurisdiction. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1158-59 (10th Cir. 2011). The standing requirements rooted in Article III apply equally on appeal as they do in the district court. *Id.* at 1159. Accordingly, this court ordered the parties to submit supplemental briefs addressing whether either appellant has standing. The analysis begins with Hugo.

## A. Hugo's Standing

### 1. Analysis

The political subdivision standing doctrine dates back at least as far as the Supreme Court's decision in *City of Trenton v. New Jersey*, which concerned the city's challenge, brought under the Contract and Due Process Clauses, to its parent state's imposition of a fee for diverting water. 262 U.S. 182, 183-84 (1923). The city had previously purchased water rights from a private company and claimed the state tax effected an uncompensated taking of its property and interfered with its contractual rights to the water. *Id.* at 184-85. Rejecting the city's claim, the Court explained that political subdivisions are created by the

---

[4](...continued)
Supreme Court or of this court sitting en banc. *United States v. Mitchell*, 518 F.3d 740, 752 n.14 (10th Cir. 2008). In any event, whether the *Trenton* line is properly viewed as a question of standing or a substantive determination that the Constitution does not afford rights to political subdivisions as against their states, the proper outcome of this case is the same.

state merely for convenience of administration. *Id.* at 185-86. The state, therefore, may delegate the function of public utilities, including the provision of water, to its political subdivisions, but the extent of that delegation "rests in the absolute discretion of the state." *Id.* at 186 (quotation omitted). The city lacked standing to sue its parent state in these circumstances, because, as the Court said, "[t]he power of the state, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for 'governmental purposes' cannot be questioned." *Id.* at 188.

The Court later applied the *Trenton* rule to hold that a political subdivision lacks standing to bring in federal court a Fourteenth Amendment equal protection challenge to its parent state's actions. *Williams v. Mayor & City Council of Balt.*, 289 U.S. 36, 40 (1933). Considering a separate, state-law claim, the Court noted that "[w]e have assumed, without deciding, that the respondents, *though without standing to invoke the protection of the Federal Constitution*, will be heard to complain of a violation of the Constitution of the state." *Id.* at 47 (emphasis added). Relying on *Trenton* and *Williams*, this court has barred political subdivisions from advancing Fourteenth Amendment claims against their parent states or other political subdivisions of the same state. *See Housing Auth. of Kaw Tribe of Indians v. City of Ponca City*, 952 F.2d 1183, 1188-89 (10th Cir. 1991); *see also City of Moore v. Atchison, Topeka, & Santa Fe Ry.*, 699 F.2d 507, 511-12 (10th Cir. 1983).

Despite the broad language in these early cases, the Supreme Court and courts of appeals have shied away from erecting an absolute bar to political subdivisions asserting rights against their parent states in federal court. In *Gomillion v. Lightfoot*, the Supreme Court explained that these early cases stood for the limited proposition that "the State's authority is unrestrained [as against political subdivisions] by the particular prohibitions of the Constitution considered in those cases," rather than granting the states "plenary power to manipulate in every conceivable way . . . the affairs of municipal corporations." 364 U.S. 339, 344 (1960). Similarly, in *Branson*, this court, while recognizing the long-standing bar to suits under the federal constitutional provisions at issue in *Trenton* and *Williams*, nonetheless concluded there was federal jurisdiction over a political subdivision's claim brought under a federal statute as a Supremacy Clause claim. 161 F.3d at 628-29. *Branson* made the following distinction: "[A] municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights," as opposed to constitutional provisions designed to protect "collective or structural rights" (i.e. the Supremacy Clause). *Id.* at 628.[5]

_____

[5]A majority of other courts to consider the question of whether a political subdivision may bring a Supremacy Clause claim against its parent state have agreed. *See S. Macomb Disposal Auth. v. Twp. of Washington*, 790 F.2d 500, 504-05 (6th Cir. 1986) (suggesting Supremacy Clause claim allowed); *United*

(continued...)

Examining the nature of the type of Supremacy Clause claim at issue in *Branson* reveals a fundamental difference between those claims and claims brought under a substantive provision of the Constitution. The Supreme Court has described the Supremacy Clause as "not a source of any federal rights" but rather operating to "secure federal rights by according them priority whenever they come in conflict with state law." *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 613 (1979) (quotations omitted). That is, a plaintiff alleging a Supremacy Clause claim is actually alleging a right under some *other* federal law, which trumps a contrary state law by operation of the Supremacy Clause.

This court's cases considering political subdivision standing are illustrative. In *Branson*, the school district alleged the Colorado Enabling Act entitled it to management of school trust lands solely for the benefit of public education. 161 F.3d at 625-26. The Supremacy Clause was invoked because the district asserted the new state law conflicted with the federal statute. *Id.* at 630. This court explained that the Colorado Enabling Act was intended to provide rights to the school district itself, as a beneficiary of what the court concluded

---

[5](...continued)
*States v. Alabama*, 791 F.2d 1450, 1454 (11th Cir. 1986) (same); *Rogers*, 588 F.2d at 1070-71 (allowing Supremacy Clause claim); *City of Bristol v. Earley*, 145 F. Supp. 2d 741, 744 (W.D.Va. 2001) (same); *Bd. of Educ. of Twp. High School Dist. No. 205 v. Ill. State Bd. of Educ.*, No. 85-L-8349, 1989 WL 106610, at *6 (N.D. Ill. Sept. 11, 1989) (same); *but see Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1363-64 (9th Cir. 1998) (no political subdivision suit against parent state allowed).

was a land trust. *Id.* at 629, 637. Accordingly, the political subdivision had standing to enforce the federal statutory right, guaranteed by operation of the Supremacy Clause in the face of conflicting state law. *Id.* at 630. Likewise, in *Kaw Tribe*, this court concluded a housing authority lacked standing to bring a Fourteenth Amendment claim against a local municipality, but could bring a claim alleging certain state conduct conflicted with the requirements of the Fair Housing Act. 952 F.2d at 1192-94. Like in *Branson*, the court determined that the housing authority fell within the group of aggrieved parties to whom the Act contemplated providing rights. *Id.* at 1194-95; *see also Branson*, 161 F.3d at 629-30 (describing *Kaw Tribe* as allowing a Supremacy Clause claim). In each case, the source of substantive rights was a federal statute directed at protecting political subdivisions, and the Supremacy Clause was invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law. This understanding of the Supremacy Clause informs the use of the words "structural" and "collective" to describe the rights political subdivisions may vindicate in federal court against their parent states. *See Branson*, 161 F.3d at 628.

The dormant Commerce Clause, unlike the Supremacy Clause, itself provides substantive rights. *See Dennis v. Higgins*, 498 U.S. 439, 447 (1991) ("It is clear, however, that the Commerce Clause does more than confer power on the Federal Government; it is also a substantive restriction on permissible state

regulation of interstate commerce." (quotation omitted)).  The Commere Clause

reads, "The Congress shall have [p]ower . . . [t]o regulate Commerce . . . among

the several States."  U.S. Const. art. I, § 8, cl. 3.  In *City of Philadelphia v. New

Jersey*, the Supreme Court explained the judicially created doctrine of the

dormant Commerce Clause:

> Although the Constitution gives Congress the power to
> regulate commerce among the States, many subjects of potential
> federal regulation under that power inevitably escape congressional
> attention because of their local character and their number and
> diversity.  In the absence of federal legislation, these subjects are
> open to control by the States so long as they act within the restraints
> imposed by the Commerce Clause itself.  The bounds of these
> restraints appear nowhere in the words of the Commerce Clause, but
> have emerged gradually in the decisions of this Court giving effect to
> its basic purpose.

437 U.S. 617, 623 (1978) (citations and quotation omitted).  Accordingly, just as

the rights at issue in *Trenton* and *Williams*, secured by Constitutional provisions

beginning with "No state shall . . . ," U.S. Const. art. I, § 10, cl. 1; U.S. Const.

amend. XIV, § 1, the dormant Commerce Clause limits the states' ability to act in

certain ways.

The parties have not identified, and this court has not found, a single case

in which the Supreme Court or a court of appeals has allowed a political

subdivision to sue its parent state under a substantive provision of the

Constitution.  Instead, courts have allowed such suits only when Congress has

enacted statutory law specifically providing rights to municipalities.  *See supra*

n.5.  This court's decisions in *Branson* and *Kaw Tribe* are entirely consistent with this great weight of precedent.  Because the claims at issue here are based on a substantive provision of the Constitution, and because the Supreme Court has made clear that the Constitution does not contemplate the rights of political subdivisions as against their parent states, Hugo lacks standing under *Branson*.  Accordingly, this court concludes Hugo has no standing to invoke the dormant Commerce Clause against the Board under the doctrine of political subdivision standing.[6]

### 2.  The Dissent

The dissent asserts the "modern trend [is] to limit the scope of the political subdivision standing doctrine," and this court's decision in *Branson* must be read

---

[6]It is noteworthy that there is an almost complete lack of cases reaching the merits of a dormant Commerce Clause claim brought by a political subdivision against its parent state.  *See City of New Bedford v. Woods Hole*, No. 00-12049, 2003 WL 21282212, at *3 (D. Mass. May 23, 2003) (granting plaintiff's motion for voluntary dismissal of dormant Commerce Clause claim); *Atl. Coast Demolition & Recycling Inc. v. Bd. of Chosen Freeholders*, 893 F. Supp. 301, 314-15 (D.N.J. 1995) (dismissing dormant Commerce Clause claim for lack of political subdivision standing)*; School Dist. v. Pa. Milk Mktg. Bd.*, 877 F. Supp. 245, 251 (E.D. Pa. 1995) (same); *cf. City of Burbank*, 136 F.3d at 1362 (describing dormant Commerce Clause claim among those brought and, without separate discussion of each claim, dismissing the entire lawsuit for lack of political subdivision standing under the Ninth Circuit's per se rule).  The one notable exception is *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353 (S.D.N.Y. 2000).  In *New Rochelle*, the court raised *sua sponte* the question of political subdivision standing as to a municipality's claims against another state political subdivision under the Fourteenth Amendment.  *Id.* at 363-65.  There is no discussion of any kind as to the application of the political subdivision standing doctrine to claims arising under the dormant Commerce Clause.  *Id.* at 362-63.

within that context. Dissenting Op. at 3. So read, the dissent contends *Branson* fully supports the conclusion that Hugo has standing to sue its parent state. *Id.* at 1, 13-19. For those reasons set out below, the dissent's reading of *Branson* is simply not tenable.

The dissent begins with the broad supposition that the modern judicial trend is to limit the scope of the Supreme Court's decisions in *Trenton* and *Williams*. *Id.* at 3. In particular, the dissent relies on the decisions in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236 (1968), to support the notion that "courts should read the earlier political subdivision standing cases more narrowly." Dissenting Op. at 9. It is certainly true that most federal courts have backed away from early twentieth century absolutist statements indicating political subdivisions can never sue their parent states. That trend is why many courts, with the notable exception of the Ninth Circuit, allow suits based on federal statutes that contemplate the rights of political subdivisions. *See Branson*, 161 F.3d at 628-30; Dissenting Op. at 6 n.4. Nevertheless, we have not found, and the dissent has not cited, a single case where a court of appeals or the Supreme Court has expressly allowed to proceed a claim by a municipality against its parent state premised on a substantive provision of the Constitution.[7] Instead, as set out

---

[7]The dissent asserts it is unsurprising there is a dearth of dormant Commerce Clause cases by municipalities against their parent states because the

(continued...)

-13-

above, this court and others have allowed suits by political subdivisions seeking to vindicate against a parent state rights granted by Congress under a federal statute. *See supra* at 7-8 & 8 n.5; *see also, e.g.*, *Branson*, 161 F.3d at 629 (claim under Colorado Enabling Act as enforced by the Supremacy Clause); *Kaw Tribe*, 952 F.2d at 1193 (claim under Fair Housing Act enforced by the Supremacy Clause); *Rogers v. Brockette*, 588 F.2d 1057, 1067-71 (5th Cir. 1979) (claim under "statutes establishing the federal school breakfast program" enforced by the Supremacy Clause).

Furthermore, the cases cited by the dissent do not support the broad assertion that the Supreme Court has strayed from its historic understanding of the Constitution as not contemplating political subdivisions as protected entities vis-a-vis their parent states. The dissent relies heavily on dicta from *Gomillion* to support its assertion that "state legislative control of municipalities is subject to constitutional limitations." Dissenting Op. at 5-7. The problem with the dissent's reliance on *Gomillion* is that the case does not involve a suit by a municipality against its parent state. Instead, *Gomillion* involves a suit by individual citizens

---

[7](...continued)
type of state regulation implicating the dormant Commerce Clause would typically favor local governments. Dissenting Op. at 12 n.10. The problem for the dissent, however, is not limited to the complete absence of appellate cases involving dormant Commerce Clause claims of the type at issue here. There is a complete absence of appellate cases involving any type of claim by a political subdivision against its parent state based on a substantive provision of the Constitution.

-14-

of Tuskegee, Alabama to enjoin, as violative of the Fourteenth and Fifteenth Amendments, a state redistricting law that changed the shape of the city. 364 U.S. at 340. The language relied upon by the dissent merely reiterates that *Trenton* and *Williams* were about particular constitutional guarantees rather than ruling that a subdivision may never sue its state. *Id.* at 343 ("[I]n dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts."). Properly read, *Gomillion* stands for the commonsense, limited proposition that a state's actions vis-a-vis municipalities may impact the rights of individuals living in the communities and that those impacted individuals are not denied the protections of the Constitution merely because the municipality itself is not contemplated by the constitutional provisions at issue. *Id.* at 345, 347-48. Contrary to the dissent's assertions, *Gomillion* is not remotely inconsistent with the view that federal statutes may provide rights to political subdivisions which they can enforce in court, while constitutional guarantees simply do not contemplate political subdivisions' own rights vis-a-vis their parent states. *See Ysursa v. Pocatello Educ. Ass'n*, 129 S. Ct. 1093, 1101 (2009) ("A private corporation enjoys constitutional protections, but a political subdivision, created by the state for the better ordering of government, has no privileges or immunities

-15-

under the federal constitution which it may invoke in opposition to the will of its creator." (citation and quotation omitted)).

Nor does the Court's decision in *Allen* support the dissent's novel assertion that the dormant Commerce Clause confers rights on Hugo. In *Allen*, an Establishment Clause case, the sole discussion of the municipal entity's standing was contained in a footnote, which said, in its entirety:

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing [the relevant state law] to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with [state law]—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a 'personal stake in the outcome' of this litigation. *Baker v. Carr*, 369 U.S. 186, 204 (1962).

392 U.S. at 241 n.5. This passage makes clear that the situation in *Allen* is very different from the situation here. In *Allen*, standing was based on the individual board members' personal stake in losing their jobs. *Id.*

Having set out its vision of a modern jurisprudential trend toward the broad availability of suits by political subdivisions to vindicate constitutional interests, the dissent then proceeds to read *Branson* as fully supportive of this purported trend. *See* Dissenting Op. at 9-13. The dissent's expansive reading of *Branson*, which completely unhinges the case from its factual moorings, is ultimately unconvincing.

The dissent begins its analysis of *Branson* by focusing largely on the following language from that decision: "Despite the sweeping breadth of [the opinions], both *Williams* and *Trenton* stand only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Branson*, 161 F.3d at 629; *see also* Dissenting Op. at 11. According to the dissent, this language from *Branson* cannot stand for the utterly modest and limited proposition that a municipality can sue its parent state only when Congress has conferred upon the municipality a right or privilege and the municipality's parent state denies it the benefit of that right or privilege in derogation of federal law. Instead, the dissent asserts, *Branson* must stand for a much more grandiose proposition: the Constitution confers on political subdivisions some "collective rights" and political subdivisions can sue their parent states to enforce those collective constitutional rights. Dissenting Op. at 11 ("*Branson* did not carve out from *Trenton* and its progeny an exception to political subdivision standing doctrine just to allow judicial review of preemption claims. Instead, *Branson* read *Trenton* as establishing a 'limited proposition' that blocks judicial review only when 'the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights.'" (quoting *Branson*, 161 F.3d at 628)).

-17-

*Branson* simply will not bear the weight the dissent seeks to place upon it. *Branson* did not involve in any way the question whether political subdivisions can sue their parent states to enforce substantive provisions of the Constitution. Instead, the case involved the far more limited question whether a political subdivision could enforce against its parent state, through the Supremacy Clause, rights accorded it by the Colorado Enabling Act, a federal statute. *Branson*, 161 F.3d at 625. In answering that question in the affirmative, *Branson* relied primarily on this court's previous decision in *Kaw Tribe* and the Fifth Circuit's decision in *Rogers*. *Id.* at 630 (adopting as the "better rule" the "one supported by *Rogers* and *Kaw Tribe*"). As is the case with *Branson*, neither *Kaw Tribe* nor *Rogers* involved a municipality trying to enforce a substantive provision of the Constitution. Instead, each involved the question whether a political subdivision could enforce against its parent state, via the Supremacy Clause, rights accorded it by a federal statute or statutory scheme. *Kaw Tribe*, 952 F.2d at 1193 (claim under Fair Housing Act enforced through the Supremacy Clause); *Rogers*, 588 F.2d at 1067-71 (claim under "statutes establishing the federal school breakfast program" enforced via the Supremacy Clause).[8] Given that *Branson* did not

---

[8]Notably, the Fifth Circuit's decision in *Rogers* fully supports the majority's reading of *Branson*. *Rogers* interpreted the *Trenton* line as holding that "the Constitution does not interfere in the internal political organization of states." 588 F.2d at 1057. So interpreted, the Fifth Circuit concluded the *Trenton* line was not implicated when a political subdivision is attempting to enforce, through the Supremacy Clause, a federal statute affording it substantive

(continued...)

-18-

involve an attempt by a political subdivision to enforce against its parent state a substantive provision of the Constitution, and further given that none of the primary authorities cited in *Branson* involved such a situation, it is odd indeed for the dissent to read *Branson* as resolving this exceedingly important issue. Instead, as set out above, *Branson* should be read, consistent with its factual underpinnings, as simply holding that *Trenton* and *Williams* do not bar suits by municipalities against their parent states to enforce, via the Supremacy Clause, the provisions of federal statutes conferring rights on those very municipalities. *See supra* at 10 ("In [both *Branson* and *Kaw Tribe*], the source of substantive rights was a federal statute directed at protecting political subdivisions, and the Supremacy Clause was invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law. This understanding of the Supremacy Clause informs the use of the words 'structural' and 'collective' to

---

[8](...continued)
rights. According to *Rogers*

> [The school district's] claim is that *Congress*, exercising its power under Article I [of the Constitution], has interfered with Texas's internal political organization, at least to the extent of allowing a school district to ignore the state's mandate to decide for itself whether to accept the breakfast program. *There is every reason to think that Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere*; the Supreme Court has never said otherwise.

*Id.* (emphasis added).

describe the rights political subdivisions may vindicate in federal court against their parent states.").[9]

Having broadly interpreted *Branson* as validating suits by political subdivisions against their parent states to enforce substantive constitutional provisions granting collective rights, the dissent proceeds to conclude the dormant

_____

[9]According to the dissent, "the majority . . . incorrectly denies that *Branson* set the stage to decide the question presented here: whether the dormant Commerce Clause was written to protect an individual right or a structural right. *Branson* anticipated this question and foreshadowed the answer." Dissenting Op. at 3. The problem with the dissent's assertion, of course, is that *Branson* offers no such foreshadowing. As set out at length above, *Branson* did not involve in any way the question whether substantive provisions of the Constitution afford rights to political subdivisions vis-a-vis their parent states. *See supra* at 18. Instead, it merely held, consistent with our prior decision in *Kaw Tribe* and the Fifth Circuit's decision in *Rogers*, that when Congress provides statutory rights to municipalities, municipalities can enforce those rights through the Supremacy Clause against their parent states. *Branson*, 161 F.3d at 629 ("Our conclusion that the school district plaintiffs have the power to bring their federal claims against the state under the Supremacy Clause and the Colorado Enabling Act is buttressed by recent case law from the circuits."). For that very same reason, the dissent is also off track in claiming

> If *Branson* meant to restrict political subdivision standing to certain preemption claims, its distinction between individual and structural rights would be superfluous. Under the majority's reading, only preemption claims count as a structural right. But Branson did not distinguish between claims based on a constitutional provision and a federal statute. It distinguished between claims based on individual and structural rights.

Dissenting Op. at 13. What would truly be odd is for *Branson* to announce a rule that political subdivisions can sue their parent states to enforce some undefined class of substantive constitutional provisions when the issue was not before the court, none of the cases cited by *Branson* involved such a question, and no other appellate court had ever so held.

-20-

Commerce Clause confers such collective rights on Hugo. Dissenting Op. at 13-19. For those reasons set out above, *Branson* simply cannot be read to embrace the notion that use of the terms "collective" and "structural" meant to refer to anything other than the situation where a political subdivision has brought suit against its parent to vindicate substantive federal statutory rights through the Supremacy Clause. Even if this court were willing, as is the dissent, to disconnect the holding in *Branson* from its facts, we would still be compelled to reject the dissent's contention that the dormant Commerce Clause protects collective rights, as opposed to individual economic rights.

Not only does the dormant Commerce Clause, unlike the Supremacy Clause, provide substantive restraints on state action, it also concerns rights that are properly characterized as guaranteed to individuals. As the Court has said, the doctrine "invalidate[s] local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). That is, a seller or buyer has a right not to be impeded in commercial transactions because of an impermissibly discriminatory state law. *Dennis*, 498 U.S. at 447 ("Th[e] combined restriction on state power and entitlement to relief under the Commerce Clause amounts to a right, privilege, or immunity under the ordinary meaning of those terms." (quotation omitted)). Hugo and Irving cite this court's decision in *Quick Payday, Inc. v. Stork*, for the proposition that the

-21-

dormant Commerce Clause protects the market, not individual firms. 549 F.3d 1302, 1309 (10th Cir. 2008). Read in context, however, the language in *Quick Payday* clearly refers to the question how to measure the burden on interstate commerce, not who holds enforceable rights under the doctrine. *See id.* In any event, structural rights described in *Branson* concern the relationship between the federal government and the states, not the relationship between the states and the private market, which the dormant Commerce Clause protects. Certainly, nothing in *Quick Payday* suggests the dormant Commerce Clause specifically contemplates the rights of political subdivisions, as did the federal laws at issue in *Branson* and *Kaw Tribe*.

The existence of what is referred to as the "market participant" exception to the dormant Commerce Clause doctrine reinforces the view that the rights protected are individual in nature.[10] In *Reeves, Inc. v. Stake*, the Supreme Court distinguished between states acting in the capacity of a market participant versus a market regulator. 447 U.S. 429, 436-37 (1980). It concluded "the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace," and thus the dormant Commerce Clause had no bearing on the actions of states when acting as a trader or

---

[10]Because ultimately this court concludes Hugo and Irving lack standing to sue the Board under the dormant Commerce Clause, there is no occasion to pass on whether the market participant exception would apply to Oklahoma's actions at issue in this case.

-22-

manufacturer itself. *Id.* As this doctrine makes clear, the rights protected by the dormant Commerce Clause are private, free trade, free market rights, inherently contemplating the protection of individuals engaged in commerce. The dormant Commerce Clause, like the Fourteenth Amendment and the Contract Clause, contemplates individual rather than structural rights under *Branson*.[11]

Finally, it is worth noting that the path taken by the dissent to reach its conclusion seems less than clear. The dissent asserts that pursuant to *Branson*,

> the relevant comparison is not between a Supremacy Clause claim and a dormant Commerce Clause claim. It is between a preemption claim based on a federal statute and a dormant Commerce Clause claim. . . .
>
> The Supremacy Clause plays the same role in either case because it requires that the federal law, whether a federal statue or the dormant Commerce Clause, will prevail if it conflicts with state law.

Dissenting Op. at 12-13. The thrust of the dissent's argument is less than clear. "[A]ll federal actions to enjoin a state enactment rest ultimately on the Supremacy Clause." *Swift & Co. v. Wickham*, 382 U.S. 111, 126 (1965). This is not only true of federal statutes and the dormant Commerce Clause, but also of the protections set out in the Contract Clause and the Fourteenth Amendment. Nevertheless, the Supreme Court has conclusively determined that municipalities cannot sue their parent states for violations of the Contract Clause or the

___

[11]As a result, whether Hugo is "substantially independent" from the state as to allow it to maintain suit against the state need not be examined. *See Branson*, 161 F.3d at 629.

Fourteenth Amendment's Due Process and Equal Protection Clauses. *See supra* at 6-7. Thus, that the dormant Commerce Clause is enforced through the Supremacy Clause says nothing at all as to whether a municipality can sue its parent state to enforce its provisions. It is for this very reason that the dissent's envisioned dichotomy between "preemption claims" and "individual rights claims" is a false dichotomy. *See Cooper v. Aaron*, 358 U.S. 1, 17-18 (1958) (holding the Supreme Court's interpretation of the Fourteenth Amendment is the supreme law of the land and is binding on the states through the Supremacy Clause).

The Supreme Court made clear in *Trenton* and *Williams* that the Constitution does not confer upon the political subdivisions rights as against their parent states. *Ysursa*, 129 S. Ct. at 1101. The rule set out in *Trenton* and *Williams* is not implicated, however, when Congress enacts positive federal law affording rights to political subdivisions. *Rogers*, 588 F.2d at 1070. Relying heavily on *Rogers*, this is the exact rule adopted by this court. *Branson*, 161 F.3d at 628-30. Because the claims advanced by Hugo are not based on a federal statutory enactment affording it federal rights, but are instead based on a constitutional provision affording individual economic rights, Hugo lacks standing to bring the claims in federal court. *Id.*

**B. Irving's Standing**

Irving, unlike Hugo, is suing not its parent state, but another state. The political subdivision standing doctrine has no applicability in such a

circumstance. Nonetheless, Irving must still meet the traditional standing requirements. Under Article III, a plaintiff must demonstrate standing to sue by showing an injury-in-fact, that the injury is fairly traceable to the defendant's conduct, and that the injury is likely to be redressed by the relief sought. *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Stewart v. Kempthorne*, 554 F.3d 1245, 1253 (10th Cir. 2009) (naming as constitutional standing requirements injury-in-fact, causation, and redressablity).

Here, Irving, a plaintiff-intervenor in the district court, based its claims of injury solely on the contract between it and Hugo for the sale of water. Its complaint explained the broad terms of the agreement, including Hugo's pending applications to modify its existing permits and obtain a new permit to fulfill its obligations under the agreement. It further alleged the challenged state laws prevented the performance of the contract, i.e., Irving's purchase of water. Irving never alleged it had any pending applications for water permits which would be affected by the challenged laws or that it had identified any other potential or actual sellers of water, including private sellers, aside from Hugo.

Even assuming Irving could demonstrate an injury-in-fact and causation, Irving's standing arguments fail on the third constitutional prong, redressability. To demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party's injury. *Coll v. First Am. Title Ins. Co.*, 642 F.3d. 876, 892 (10th Cir. 2011). This court previously considered the standing of a

-25-

commercial timber company to challenge an agency preservation plan which prevented the sale of timber rights in a particular area. *Wyo. Sawmills, Inc. v. U.S. Forest Serv.*, 383 F.3d 1241, 1246-47 (10th Cir. 2004). The timber company's standing ultimately failed because "the federal agency has complete discretion as to whether to offer the opportunity sought by the plaintiff, and accordingly, the courts do not have the power to grant the only relief that would rectify the alleged injury." *Id.* at 1249.

The circumstances here are analogous. If a federal court were to declare, as Irving urges, the challenged Oklahoma laws unconstitutional under the dormant Commerce Clause, the dormant Commerce Clause still would not constrain the Board's actions with respect to Hugo's permit applications. As explained above, Hugo's "power to hold and manage" water rights "rests in the absolute discretion of the state." *City of Trenton*, 262 U.S. at 186 (quotation omitted).[12] Invalidating the challenged laws under the dormant Commerce Clause would not compel the Board to grant Hugo's applications, or even to process them in any particular way. As Hugo and Irving's joint reply brief on appeal asserts, the lawsuit challenges the Board's "ability to discriminatorily deny Hugo's application to appropriate Oklahoma water." Because Hugo does not have rights under the

---

[12]The state is free, of course, as a matter of state law, to give rights to its political subdivisions and give the power to enforce those rights in state court. Whether Hugo possesses rights under any law other than the dormant Commerce Clause is not presented in this case.

-26-

dormant Commerce Clause against its parent state, Irving's injury would not be redressed by the remedy it seeks.

The cases cited by Hugo and Irving for the proposition that political subdivisions of one state may sue another state under the dormant Commerce Clause over allegedly discriminatory water permitting laws are inapposite because they do not involve a political subdivision of one state whose claim is premised on a contract with a political subdivision of the defendant state. Rather, those cases concern political subdivisions attempting to access the private market or obtain a permit directly from the defendant state. *See, e.g.*, *City of El Paso v. Reynolds*, 563 F. Supp. 379, 381 (D.N.M. 1983) (city in Texas sought water permit directly from permitting authority of New Mexico and also contracted for the purchase of water from a private New Mexico company); *City of Altus v. Carr*, 255 F. Supp. 828, 831 (W.D. Tex. 1966) (city in Oklahoma contracted for purchase of water from private landowners in Texas). Because of that posture, were a court to declare the challenged state laws in those cases unconstitutional, plaintiffs' injuries would be redressed because the defendants would be prohibited from applying the unconstitutional law to the applications of private entities and out-of-state municipalities. The case here is very different. Because Irving's standing is premised solely on its contract with Hugo, and because Hugo itself possesses no rights under the dormant Commerce Clause as against its parent

-27-

state, Irving is unable to meet the third constitutional standing requirement of redressability.

## IV. Conclusion

For the foregoing reasons, the district court's order is **VACATED** and the case is **REMANDED** to the district court to dismiss for lack of federal jurisdiction.

10-7043, 10-7044, *Cities of Hugo and Irving v. Nichols, et al.*
**MATHESON**, J., dissenting.

I would reach the merits because Hugo and Irving have standing. I therefore respectfully dissent.

Hugo has standing based on *Branson School District RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998). *Branson* was decided sixty-five years after the Supreme Court last denied political subdivision standing to a plaintiff. During that interval, the trend in the Supreme Court and lower courts was to limit the doctrine to claims based on the specific constitutional provisions invoked in the early Supreme Court cases. As part of that trend, *Branson* granted political subdivision standing in a preemption case and formulated a test that allows standing when the plaintiff makes a structural constitutional claim and the plaintiff is sufficiently independent of the parent state. Hugo alleged such a structural claim when it challenged Oklahoma water statutes as unconstitutional under the dormant Commerce Clause. Hugo therefore should receive a decision on the merits.

Irving has standing even if Hugo does not. The political subdivision standing doctrine does not apply to Irving. Apart from Hugo, Irving has asserted a justiciable claim because the Oklahoma water statutes block implementation of its contract to import water from Hugo and because a favorable ruling on its dormant Commerce Clause challenge will remove that barrier.

**A.  *Hugo***

I part ways with my colleagues on how to read *Branson*. The majority reads *Branson* as allowing a political subdivision to sue its parent state when it claims that a

federal statute preempts state law. I read *Branson* as allowing a political subdivision to sue its state for a dormant Commerce Clause violation.[1]

The majority and dissenting opinions in this case share much common ground. We agree that courts, including *Branson*, have "shied away from erecting an absolute bar to political subdivisions asserting rights against their parent states in federal court." Maj. Op. at 8. We also agree that *Branson* recognizes an exception to the political subdivision standing doctrine for certain preemption claims. We further agree that *Branson* allows standing for claims that seek to protect a structural right.

My basic disagreement with the majority is its failure to recognize that *Branson* set the terms for future consideration of political subdivision standing in this circuit. *Branson* canvassed the early Supreme Court cases that prohibited standing and found them to establish only the "limited proposition" that political subdivisions lack standing

---

[1]The issue here differs from our contemporary understanding of Article III standing, which focuses on a plaintiff's personal stake in redressing an injury through federal litigation. In *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979), the Fifth Circuit traced the political subdivision standing doctrine to *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819), which held that the Contract Clause applies to grants of "private" powers—such as the charter that the colonial government issued to Dartmouth—and not to grants of "political" powers—state laws affecting public institutions. *See* 17 U.S. at 627-30. The Fifth Circuit understood the political subdivision standing doctrine as faithful to the *Dartmouth College* principle "that the Constitution does not interfere in the internal political organization of states." 588 F.2d at 1069.

This principle appears to be based on implied federalism limits. If the political subdivision standing doctrine blocks federal court interference with the "internal political organization of states," neither the preemption claim in *Branson* nor Hugo's claim here undermines that principle. We must, of course, analyze Hugo's suit under our circuit's precedent, which is the analytical framework developed in *Branson*. That framework allows political subdivision standing "when the constitutional provision that supplies the basis for the complaint was written to protect . . . structural rights." 161 F.3d at 628.

2

when a claim is based on a "constitutional provision . . . written to protect individual rights." 161 F.3d at 628. *Branson* allows standing when the claim is based on a "constitutional provision . . . written to protect . . . structural rights." *Id.*

The majority is correct that *Branson* did not resolve the "exceedingly important issue" of whether a dormant Commerce Clause claim can support political subdivision standing. *See* Maj. Op. at 20. And although the majority correctly reminds us that *Branson* allowed standing for a preemption claim, it incorrectly denies that *Branson* set the stage to decide the question presented here: whether the dormant Commerce Clause was written to protect an individual right or a structural right. *Branson* anticipated this question and foreshadowed the answer.

The answer is that the dormant Commerce Clause protects a structural right and thereby supports political subdivision standing. The rationale for my position will be presented by (1) describing how broad language in early Supreme Court cases that prevented political subdivision suits has been interpreted more narrowly over time; (2) explaining the *Branson* court's analysis of the scope of political subdivision standing; (3) addressing whether the constitutional claim in this case is a structural or an individual right claim; and (4) having concluded that Hugo is alleging a structural claim, showing that Hugo is sufficiently independent of its parent state to litigate that claim.

**1.** *Limiting Broad Dicta of Early Cases*

*Branson* should be read in the context of the modern trend to limit the scope of the political subdivision standing doctrine. *Branson* interpreted two early Supreme Court decisions, *Trenton v. New Jersey*, 262 U.S. 182 (1923), and *Williams v. Mayor of*

3

*Baltimore,* 289 U.S. 36 (1933). These cases contain broad dicta suggesting that a municipality can never sue its parent state.

In *Trenton*, the city claimed that a New Jersey statute imposing a fee on the city for withdrawing water from the Delaware River violated the Contract Clause and the Fourteenth Amendment's Due Process Clause. *See* 262 U.S. at 183. The Court ruled for New Jersey, holding that "[a] municipality is merely a department of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit." *Id.* at 187.

*Trenton* relied on an earlier precedent, *Hunter v. City of Pittsburgh*, 207 U.S. 161 (1907). In *Hunter* the Court approved Pennsylvania's right to annex the City of Allegheny into the City of Pittsburgh over Allegheny's objections based on the Contract Clause and the Due Process Clause. *Id.* at 179. After listing the powers of a state over its municipalities, the Court concluded that "[i]n all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the constitution of the United States." *Id.*

In *Williams*, the Court rejected an equal protection challenge to a Maryland statute exempting a railroad from local taxes. 289 U.S. at 40. Justice Cardozo explained that "[a] municipal corporation . . . has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Id.*

It would be difficult to square *Branson's* allowing a political subdivision to sue its parent state with the sweeping dicta of these cases. But the legal landscape changed between 1933 and 1998, and *Branson* was decided after the Supreme Court had taken a narrower view of these earlier decisions.

4

The Supreme Court did not address political subdivision standing after *Williams* until *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). In *Gomillion*, African-American citizens of Alabama sought to enjoin the mayor of Tuskegee and other local officials from enforcing a redistricting plan that, they argued, violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Fifteenth Amendment. *Id.* at 340. The defendants, relying on *Hunter*, "invoke[d] generalities expressing the State's unrestricted power—unlimited, that is, by the United States Constitution—to establish, destroy, or reorganize by contraction or expansion its political subdivisions, to wit, cities, counties, and other local units." *Id.* at 342. The Court, commenting on *Hunter* and *Trenton*, explained that

> the cases that have come before this Court regarding legislation by States dealing with their political subdivisions fall into two classes: (1) those in which it is claimed that the State, by virtue of the prohibition against impairment of the obligation of contract (Art. I, s 10) and of the Due Process Clause of the Fourteenth Amendment, is without power to extinguish, or alter the boundaries of, an existing municipality; and (2) in which it is claimed that the State has no power to change the identity of a municipality whereby citizens of a pre-existing municipality suffer serious economic disadvantage.

*Id.* at 343.[2]

The Court determined that the earlier cases' precedent should be limited to the specific constitutional provisions that those cases addressed. *See id.* at 344. Justice Frankfurter stated for the Court that

> a correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for

---

[2]Hugo's claim is not based on the Contract Clause or the Due Process Clause, and it has nothing to do with Hugo's "boundaries" or "identity." *Gomillion*, 364 U.S. at 343.

5

every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.

*Id.*

The Court summarized its position:

This line of authority conclusively shows that the Court has never acknowledged that the States have power to do as they will with municipal corporations regardless of consequences. Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution.

*Id.* at 344-45.[3]

*Gomillion* was not a suit between a municipality and its parent state. But its interpretation of the cases that created the political subdivision standing doctrine is telling. The Court said that state legislative control of municipalities is subject to constitutional limitations. Under the *Gomillion* analysis, *Hunter*, *Trenton*, and *Williams* prevent political subdivision standing only when a municipality attempts to sue its parent state under the Fourteenth Amendment or the Contract Clause. Some of the circuits also have limited the broad dicta of the earlier cases.[4]

---

[3]*Compare Gomillion*, 364 U.S. at 344-45 ("Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution.") *with* Maj. Op. at 16 ("*Gomillion* is not remotely inconsistent with the view that federal statutes may provide rights to political subdivisions which they can enforce in court, while constitutional guarantees simply do not contemplate political subdivisions' own rights vis-a-vis their parent states.").

[4]There is a circuit split on the political subdivision standing doctrine. The Ninth Circuit appears to be alone in adopting a per se rule against a political subdivision having standing to sue its parent state. *See City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233 (9th Cir. 1980) (establishing the Ninth Circuit's per se rule); *see also Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1110 (9th Cir. 1999) (. . . cont'd)

6

The majority argues that the Supreme Court's language in *Gomillion* expressing skepticism about the political subdivision standing doctrine is dicta. But so is much of the language from *Hunter*, *Trenton* and *Williams* that created the political subdivision standing doctrine. With their dicta stripped, those cases hold that a municipality cannot bring suits against its parent state on Contract Clause, Due Process Clause, or Equal Protection Clause grounds. In determining whether a municipality may bring a dormant Commerce Clause claim, it is at least as helpful to examine the Supreme Court's dicta

(Hawkins, J., concurring) (noting that other circuits have not adopted a per se rule). We said in *Branson* that it was arguable whether the Second Circuit had adopted a per se rule in *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973). *See Branson*, 161 F.3d at 630 n. 8.

The Fifth and Eleventh Circuits join the Tenth Circuit in rejecting a per se rule. *See Rogers v. Brockette*, 588 F.2d 1057, 1071 (5th Cir. 1979) (holding that "the *Hunter* and *Trenton* line of cases do not, properly speaking, deal with a municipality's standing to sue the state that created it" and reaching the merits of a preemption challenge by a local school district against state education authorities); *United States v. Alabama*, 791 F.2d 1450, 1455 (11th Cir. 1986) (holding that "no per se rule applies in this Circuit. In assessing the standing to sue of a state entity, we are bound by the Supreme Court's or our own Court's determination of whether any given constitutional provision or law protects the interests of the body in question").

Other circuits have expressed skepticism about a per se rule without definitively resolving the issue. *See City of Charleston v. Pub. Serv. Comm'n of W. Va.*, 57 F.3d 385, 390 (4th Cir. 1995) (reaching the merits of a suit between a city and a state agency after noting that the political subdivision standing doctrine is "unclear"); *Amato v. Wilentz*, 952 F.2d 742, 755 (3d Cir. 1991) (finding that "[j]udicial support for this rule may be waning with time"); *S. Macomb Disposal Auth. v. Twp. of Washington*, 790 F.2d 500, 504 (6th Cir. 1986) (noting that "[t]here may be occasions in which a political subdivision is not prevented, by virtue of its status as a subdivision of the state, from challenging the constitutionality of state legislation").

Even the Ninth Circuit's rule has been called into question. *See Palomar*, 180 F.3d at 1110 (Hawkins, J., concurring) ("The existence of a contrary view in other circuits does not automatically suggest a need to reexamine our own position. However, where the other circuits' view is well and thoroughly reasoned, we should at least satisfy ourselves that our position is grounded in an equally solid rationale").

7

from 1960 as its dicta from 1907, 1923, and 1933, particularly because *Gomillion* spoke directly to the scope of the doctrine.

Consistent with the trend reflected in *Gomillion*, in *Board of Education of Central School District v. Allen*, 392 U.S. 236 (1968), the Court reached the merits of an Establishment Clause challenge to a New York education statute brought by two local school boards against the state education commissioner of their parent state. The majority points to *Allen*'s reference to individual board members' "personal stake" in the case, Maj. Op. at 17 (quoting *Allen*, 392 U.S. at 241 n.5), but the school boards, not their individual members, were the plaintiffs. What the Court did not do in *Allen*—and in any other case since 1933—is follow *Trenton* and *Williams* and deny political subdivision standing to a political subdivision. As Justices Marshall and White later said, *Allen* cannot be squared with a bar against political subdivisions' raising constitutional claims against their parent states. *See City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 449 U.S. 1039, 1042 (1980) (White, J., joined by Marshall, J., dissenting from denial of certiorari).[5]

The foregoing cases inform the different readings of *Branson* in this case. The majority reads *Branson* as a narrow exception to a broad prohibition of political subdivision standing. The dicta in early Supreme Court cases support this reading. But,

_____

[5]This is not to suggest that *Allen* erased the political subdivision standing doctrine sub silencio. The Supreme Court has cautioned that "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch. Tuition Org. v. Winn*, — U.S. —, 131 S. Ct. 1436, 1448 (2011).

8

as the majority acknowledges, courts have retreated from the "absolutist" gloss of the early cases.[6]  Maj. Op. at 14.  Taken together, *Gomillion* and *Allen* suggest that courts should read the earlier political subdivision standing cases more narrowly than the broad dicta of the earlier cases.  That is precisely what *Branson* did.[7]

### 2.  **Branson** *and Constitutional Claims*

When *Branson* granted political subdivision standing on a federal preemption claim, it never declared that a political subdivision could sue its parent state *only* for a

---

[6]One reason for courts to be skeptical about a blanket standing prohibition is that the early cases failed to specify clearly the constitutional basis for the doctrine.  For example, the majority notes "there is serious reason to doubt whether 'standing' in the Article III context is at issue."  Maj. Op. at 5 n.4.  Given the doctrine's uncertain foundation, courts such as *Branson* have regarded the *Trenton*/*Williams* precedent as limited to certain constitutional provisions.  With the early cases standing for such a "limited proposition," *Branson*, 161 F.3d at 628, it follows that it is possible for a political subdivision to rely on a constitutional provision outside the "limited proposition" provisions.

[7]The majority refers to *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 129 S. Ct. 1093, 1101 (2009).  *Ysursa* cites to *Trenton* and *Williams*, but only to establish that states may impose regulations on local governments, not that those regulations are immune from constitutional scrutiny.  In *Ysursa*, the Court upheld Idaho's ban on political payroll deductions as applied to local governmental units under rational basis review.  A local teacher's union had challenged the state law as "obstructing speech in the local governments' payroll systems" under the First Amendment.  *Id.* at 1100.  The *Ysursa* Court's central point was that if the law were constitutionally valid at the state level, it was valid at the local level: "The State's legislative action is of course subject to First Amendment and other constitutional scrutiny whether that action is applicable at the state level, the local level, both, or some subpart of either."  *Id.* at 1100.  The Court said it was "aware of no case suggesting that a different analysis applies under the First Amendment depending on the level of government affected, and the unions have cited none."  *Id.* *Ysursa* says nothing about whether local government entities have standing to challenge unconstitutional state laws that affect them.

9

preemption claim.[8] The majority would freeze this circuit's exception to the political subdivision standing doctrine to certain preemption claims. But *Branson* recognized a broader exception that would allow future consideration of claims based on constitutional provisions written to protect structural rights. *Branson* did not list which constitutional provisions might qualify because the immediate issue was whether the plaintiffs had standing for their preemption claim. The court left open whether a constitutional provision such as the dormant Commerce Clause would fit its structural rights category.

In *Branson*, school districts brought a preemption challenge against a voter-approved amendment to the Colorado Constitution, alleging that the amendment violated a federal land trust established by Congress in the Colorado Enabling Act. *See* 161 F.3d at 625. The defendant state officials argued that the school districts, as political subdivisions, could not sue their parent state. *Id.* at 628. We recognized the political subdivision standing doctrine stemming from *Trenton* and *Williams*: "It is well-settled that a political subdivision may not bring a federal suit against its parent state based on rights secured through the Fourteenth Amendment." *Id.* (citations omitted). We upheld

---

[8]The majority quotes from *Rogers* that "[t]here is every reason to think that Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere; the Supreme Court has never said otherwise." 588 F.2d at 1070; *see* Maj. Op. at 19 n.8. The proposition that "the Constitution does not interfere in the internal political organization of states," *Rogers,* 588 F. 2d at 1070, is compatible with the idea that a political subdivision may raise a constitutional claim against its parent state when that claim (1) does not interfere with the political organization of the state, and (2) following *Branson*, does not rely on a constitutional provision written to protect individual rights. Hugo is not challenging Oklahoma's internal political organization; it is challenging Oklahoma's allegedly unconstitutional water laws.

the school districts' right to sue. *Id.* at 629-30.

Addressing the scope of political subdivision standing, we held that, "[d]espite the sweeping breadth of [their] language," the earlier cases rejecting standing for municipalities raising constitutional challenges against their parent states "stand only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Id.* We concluded that "a political subdivision has standing to bring a constitutional claim against its creating state when the substance of its claim relies on the Supremacy Clause and a putatively controlling federal law." *Id.*

*Branson* did not carve out from *Trenton* and its progeny an exception to political subdivision standing doctrine just to allow judicial review of preemption claims. Instead, *Branson* read *Trenton* as establishing a "limited proposition" that blocks judicial review only when "the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Id.*

In this case, the City of Hugo, an Oklahoma political subdivision, sued members of the OWRB, an Oklahoma state agency, in their official capacities.[9] The difference between this case and *Branson* is that Hugo asserts a dormant Commerce Clause claim and the *Branson* plaintiffs alleged a preemption claim. This court has not previously

_____

[9]As *Branson* explained, "a suit against a state official in his representative capacity is considered a suit against the official's office, which is no different from a suit against the State itself." 161 F.3d at 628 (quotation omitted).

11

addressed whether a political subdivision can sue a state for a dormant Commerce Clause violation, but *Branson* clearly opened the door for a claim based on a "constitutional provision . . . written to protect . . . structural rights." *Id.* at 628. The question in this case, clearly within the *Branson* ambit, is whether Hugo's dormant Commerce Clause claim is based on a structural or an individual right.[10]

*Branson* explains that "a political subdivision has standing to bring a constitutional claim against its creating state when the substance of its claim relies on the Supremacy Clause and a putatively controlling federal *law*." *Id.* (emphasis added). Federal law includes, of course, not only statutes but also constitutional provisions. And *Branson* did not say that a political subdivision may only sue a parent state when its claim relies on the Supremacy Clause and a federal *statute*.

Applying *Branson* to *Hugo*, the relevant comparison is not between a Supremacy Clause claim and a dormant Commerce Clause claim. It is between a preemption claim based on a federal statute and a dormant Commerce Clause claim. When either is the basis for a challenge to a state law, the Supremacy Clause is essential to the challenge. The majority is correct that "a plaintiff alleging a Supremacy Clause claim is actually alleging a right under some *other* federal law, which trumps a contrary state law by operation of the Supremacy Clause." Maj. Op. at 10 (emphasis in original). But that is exactly what Hugo is doing—alleging a claim under the dormant Commerce Clause,

---

[10]Neither the Supreme Court nor a circuit court has addressed this specific question. We should expect a paucity of dormant Commerce Clause cases of this type. State regulation to benefit local interests rarely disadvantages local governments.

12

which is the "other federal law [that] trumps a contrary state law by operation of the Supremacy Clause."

The Supremacy Clause plays the same role in either case because it requires that the federal law, whether a federal statute or the dormant Commerce Clause, will prevail if it conflicts with state law. All claims alleging a conflict between state law and federal law rely upon the Supremacy Clause priority rule that the "Constitution, and Laws of the United States . . . and all Treaties . . . shall be . . . supreme." U.S. CONST. ART. VI, cl. 2.

If *Branson* meant to restrict political subdivision standing to certain preemption claims, its distinction between individual and structural rights would be superfluous. Under the majority's reading, only preemption claims count as a structural right. But *Branson* did not distinguish between claims based on a constitutional provision and a federal statute. It distinguished between claims based on individual and structural rights. We should therefore decide whether a dormant Commerce Clause claim is based on an individual or structural right.

### 3. *Hugo's Dormant Commerce Clause Claim Is Structural*

*Branson* divides political subdivision constitutional claims into two categories: structural rights claims, which support standing, and individual rights claims, which do not. [11] We know from *Branson*'s reading of *Hunter*, *Trenton*, and *Williams* that the

---

[11]This dissent compares preemption claims and dormant Commerce Clause Claims. It also analyzes the *Branson* distinction between constitutional provisions that protect individual rights with those that protect structural rights. Nowhere does it address what the majority calls a "false dichotomy" between "preemption claims" and "individual rights" claims. Maj. Op. at 23-24. The majority, on the other hand, places "substantive" (. . . cont'd)

13

Contract Clause, Due Process Clause, and Equal Protection Clause fall into the individual rights claims category. Dormant Commerce Clause claims, properly understood, fall into the structural rights category.

Branson does not elaborate on its distinction between structural and individual rights. But *Branson*'s allowing a political subdivision to bring a preemption claim provides a clue to understanding the distinction. A preemption claim alleges that a federal statute is supreme relative to conflicting state law. Such a claim is structural because it concerns the relative authority of federal and state government. An individual right claim, by contrast, concerns the limits of government authority over the individual. Dormant Commerce Clause claims are more like preemption than individual rights claims because they concern the relative power of federal and state government. They ask whether state law improperly interferes with an area of federal concern—interstate commerce.[12]

---

constitutional provisions off limits for political subdivision standing. Maj. Op. *passim*. But *Branson* does not distinguish between substantive and non-substantive constitutional provisions. Instead, *Branson* distinguishes between a "constitutional provision . . . written to protect individual rights," and a "constitutional provision . . . written to protect . . . structural rights." 161 F.3d at 628. *Branson* forecloses standing when the constitutional provision concerns an "individual" right, not a "substantive" right. Indeed, *Branson* does not use the term "substantive" in addressing the scope of political subdivision standing.

[12]Instructive analysis comes from an unlikely source. In *Star-Kist Foods, Inc. v. County of Los Angeles*, 719 P.2d 987, 992 (Cal. 1986), *cert. denied*, 480 U.S. 930 (1987), the California Supreme Court allowed a political subdivision to raise a dormant Commerce Clause challenge to its parent state's law. *Star-Kist* said a dormant Commerce Clause claim should be treated like a preemption claim for political subdivision standing. Relying on *Rogers* and rejecting the Ninth Circuit's per se rule (. . . cont'd)

An additional clue to understanding *Branson's* distinction between individual and structural rights are the words "written to protect" in *Branson's* key passage that political subdivision standing is forbidden only when "the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights."  161 F.3d at 628.

The Bill of Rights, the Contract Clause (at issue in *Hunter* and *Trenton*), the Due Process Clause (at issue in *Hunter* and *Trenton*), and the Equal Protection Clause (at issue in *Williams*) were "written to protect" individual rights.  By contrast, the enumerated powers of Article I, Section 8 both authorize and limit what Congress can do, and, from the standpoint of limiting power, were "written to protect" states' rights.  The Commerce Clause, therefore, was "written to protect" the allocation of power between the federal government and the states.  *See* Akhil Reed Amar, America's Constitution:  A Biography 105-08 (2005); The Federalist No. 45 (James Madison).  The implied dormant Commerce Clause protects that structural allocation.

Hugo's dormant Commerce Clause claim, like the preemption claim in *Branson*,

---

against political subdivision standing, the court explained that "[p]olitical subdivisions cannot assert constitutional rights which are intended to limit governmental action vis-a-vis individual citizens but may invoke the supremacy clause to challenge preempted state law." 719 P.2d at 991 (quotation omitted).  *Star-Kist* reasoned that "the commerce clause resembles the supremacy clause in that it, albeit indirectly, defines the relative powers of states and the federal government," and "it relates more to the national interest in observing the boundaries of state and federal power."  *Id.* at 991-92 (quotation omitted).  The caveats, of course, are that *Star-Kist* is not a federal case, and the political subdivision standing issue arose in the unusual procedural posture of reviewing whether a constitutional defense was valid.

15

addresses structural issues. "[T]here is widespread acceptance of our authority to enforce the dormant Commerce Clause, which we have but inferred from the constitutional structure as a limitation on the power of the States." *United States v. Lopez*, 514 U.S. 549, 579 (1995) (Kennedy, J., concurring). The dormant Commerce Clause doctrine provides that, unless authorized by Congress, states lack power to regulate in certain matters reserved for national legislation.

Both dormant Commerce Clause claims and preemption claims based on federal laws enacted pursuant to the Commerce Clause concern the relationship between federal and state governments and the relative scope of federal and state power. These claims represent the two situations where Article I of the Constitution restrains state regulation of commerce. *See* Kathleen M. Sullivan & Gerald Gunther, Constitutional Law 175 (17th ed. 2010). Congressional intent on the relation between state and federal law is a critical issue when a preemption claim is based on Congress's exercise of its Commerce Clause power and also when a dormant Commerce Clause claim may be resolved based on whether Congress authorized state regulation. These are "techniques Congress may employ in the ordering [of] relations between the nation and the states." *Id.* at 243.

One leading commentator understood the dormant Commerce Clause to be exactly the sort of structural right that *Branson* meant to allow political subdivision standing: "The Fifth and Tenth Circuits, for example, have limited cities' standing to cases that involve claims under the Supremacy Clause and other *structural* restrictions on state power, such as the *Dormant Commerce Clause*." David J. Barron, *Why (and When) Cities Have a Stake in Enforcing the Constitution*, 115 Yale L.J. 2218, 2250 (2006)

(emphasis in original).

The conceptual affinity of the preemption doctrine and the dormant Commerce Clause is reflected in cases where both types of challenges are raised against the same statute. For example, in *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), a New Jersey law banning importation of solid and liquid waste from out of state to New Jersey landfills was challenged under both the preemption doctrine and the dormant Commerce Clause. The Court held that federal legislation did not preempt the state law, *id.* at 620, but also held that the state law violated the dormant Commerce Clause, *id.* at 629.

The resemblance between preemption and dormant Commerce Clause arguments is especially clear in cases addressing whether a federal statute gives congressional consent to state regulation and therefore insulates a state law from dormant Commerce Clause challenge. In *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941 (1982), the Court considered whether federal laws consented to a Nebraska law limiting out-of-state transfer of groundwater and thereby insulated it from dormant Commerce Clause challenge. The Court said no. *Id.* at 960. The question in consent cases such as *Sporhase* and in preemption cases is what state legislation Congress intended to allow or disallow when it enacted a federal statute.

Whether the issue is preemption (Congress has spoken in conflict with state law), dormant Commerce Clause (Congress is silent), or consent (Congress has spoken to authorize state law), all address a common question: the state's power to act. When a federal statute or the dormant Commerce Clause invalidates a state law, in both instances the Supremacy Clause requires that result, and both instances involve a federalism

17

analysis, not an individual rights analysis.

In this case, as in *Branson*, Congress has spoken.  A central question is whether the Red River Compact authorizes the Oklahoma statutes that limit interstate commerce in water.  Whether the issue is congressional preemption in *Branson* or congressional consent in this case, both are hinged to structural analysis and determining congressional intent.

The majority correctly indicates that Hugo and Irving have their own economic interests in the outcome of the litigation.  But it does not follow that their claim is correctly characterized as based on "constitutional provisions . . . written to protect individual rights."  *Branson*, 161 F.3d at 628.  Party interests are at stake in both preemption and dormant Commerce Clause claims, but the nature of the claim— adjudicating the power of the state relative to that of the federal government—is structural, a question of relative state and federal power.  Indeed, the Commerce Clause, upon which the dormant Commerce Clause is based, authorizes Congress to regulate interstate commerce and, as an enumerated right, was in part "written to protect" the states from federal overreaching.  Litigants basing claims on this Article I provision ask courts to adjudicate questions of relative federal and state power, the answers to which affect the parties' interests.  In short, such cases call for constitutional interpretation of federal rights and state power—structural rights—not individual rights.

Given our Article III standing requirements calling for a plaintiff to show a redressable individual injury in all federal cases, individual interests are virtually always at stake irrespective of the legal basis for the claim.  It does not follow that all such

18

claims except for preemption cases fit *Branson*'s category of individual rights claims.

Dormant Commerce Clause claims fit *Branson's* structural category.[13]

The scope of analysis presented here is narrow and does not envision, as the majority describes, "a broad availability of suits by political subdivisions to vindicate constitutional interests." Maj. Op. at 16. If this dissent were the holding in this case, it would stand only for the proposition that a municipality may sue the state to challenge state laws as unconstitutional under the dormant Commerce Clause because such a claim fits within our *Branson* analysis. Whether any other constitutional provisions would support political subdivision standing is not addressed here.

### 4. *Hugo's Independence*

According to *Branson*, in addition to making a claim based on a structural right, a

---

[13]The few district court cases from other circuits that involved dormant Commerce Clause claims and the political subdivision standing doctrine do not tell us much. In *City of New Bedford v. Woods Hole*, No. Civ. A 00-12049-DPW, 2003 WL 21282212 (D. Mass. May 23, 2003), the court granted plaintiff's motion to dismiss without prejudice and did not take a position on the political subdivision standing question, noting that "[t]he principal procedural question at issue—whether a political subdivision of a state has standing to litigate in federal court against another political subdivision of the same state—is one on which the circuits are presently split." *Id.* at *2. Dormant Commerce Clause challenges were dismissed on political subdivision standing grounds in two pre-*Branson* cases from another circuit. *See Sch. Dist. of Phila. v. Pa. Milk Mktg Bd.*, 877 F. Supp. 245 (E.D. Pa. 1995); *Atl. Coast Demolition & Recycling Inc. v. Bd. of Chosen Freeholders*, 893 F. Supp. 301 (D.N.J. 1995). *Atlantic Coast* relied on the precedent of *Philadelphia*. *See Atlantic Coast*, 893 F. Supp. at 315. In *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353 (S.D.N.Y. 2000), the court dismissed a Fourteenth Amendment claim on political subdivision standing grounds but did not dismiss a dormant Commerce Clause claim. *See id.* at 364, 368-69. The court explained that "while municipalities or other state political subdivisions may challenge the constitutionality of state legislation on certain grounds and in certain circumstances, these do not include challenges brought under the Due Process or Equal Protection Clauses of the Fourteenth Amendment." *Id.* at 364.

19

political subdivision must be "substantially independent" from its parent state to have standing. *See Branson*, 161 F.3d at 639 (quoting *Lassen v. Arizona ex rel. Arizona Highway Dep't*, 385 U.S. 458, 459 n. 1 (1967)). The school districts in Colorado were substantially independent because they "may hold property in their own name, enter into contracts, and they have the right to sue and be sued in their own name." *Id.* at 629. We also noted that the districts "are led by boards that are elected independently." *Id.*

The City of Hugo is substantially independent of Oklahoma. Hugo can hold property in its own name, enter into contracts, and sue and be sued in its own name. *See* OKLA. STAT. tit. 11, 22-101, 22-104, 37-117. Because Hugo is raising a claim based on a constitutional provision that protects structural rights and is substantially independent from the State of Oklahoma, I would hold that Hugo has standing.

## B. *Irving*

Even if the City of Hugo lacks political subdivision standing, this case should proceed to the merits because the City of Irving has standing to raise the dormant Commerce Cause claim. As the majority notes, Irving, a Texas municipality, faces no political subdivision standing bar. The majority holds that Irving does not meet the redressability requirement of Article III standing.

"Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, — U.S. —, 130 S. Ct. 2743, 2752 (2010). "It must be the effect of the court's judgment on the defendant that redresses the plaintiffs' injury, whether directly or indirectly." *Coll v.*

20

*First Am. Title Ins. Co.*, 642 F.3d 876, 892 (10th Cir. 2011) (quoting *Nova Health Sys. v. Gandy,* 416 F.3d 1149, 1159 (10th Cir. 2005)).

Irving's alleged injury is its inability to import water from Oklahoma pursuant to its contract with Hugo. Irving claims that certain Oklahoma water statutes cause this injury because they restrict interstate water transfers compared to intrastate water transfers. The injury is redressable because a successful dormant Commerce Clause challenge to these statutes will remove a major barrier to Irving's plan to use Hugo's water.

The majority argues that Irving's contract with Hugo makes Irving's Article III standing dependent on Hugo's standing and that dismissal of Hugo under the political subdivision standing doctrine eliminates redressability for Irving. But in my view, the contract cuts the other way. By entering the contract, Hugo as seller and Irving as buyer of water have an equal and mutual stake in performance of the contract and the transfer of the water. Hugo, not Irving, is the applicant to the OWRB for approval of the water transfer. But even if Hugo is dismissed from this case because it cannot sue its parent state, Hugo's application remains before the OWRB.

Irving has as much stake in the application as Hugo does by virtue of their contract, and Irving's dormant Commerce Clause claim, if successful, would declare the Oklahoma water statutes unconstitutional and thereby help pave the way for approval of the application. The contract ties Irving to the OWRB's decision on the application and enables Irving to meet the elements of Article III standing. It is reasonable to expect that the OWRB would respect and follow a decision of this court that the Oklahoma water

21

laws restricting interstate transfer of water from Hugo to Irving are unconstitutional under the dormant Commerce Clause.

For its redressability analysis, the majority relies on *Wyoming Sawmills Inc. v. U.S. Forest Service*, 383 F.3d 1241 (10th Cir. 2004). In *Wyoming Sawmills*, a timber company alleged that the Forest Service violated the Establishment Clause by expanding a protected area to protect a Native American religious site. *Id.* at 1243-45. The company's alleged injury was its inability to access the expanded site to cut timber. *Id.* at 1246. We held that the timber company's injury was not redressable:

> Wyoming Sawmills has not shown that a timber lease would 'likely' become available on the lands within the area of consultation if plaintiff were to have the HPP set aside . . . the federal agency has complete discretion as to whether to offer the opportunity sought by the plaintiff, and accordingly the courts do not have the power to grant the only relief that would rectify the alleged injury.

*Id.* at 1249.

Wyoming Sawmills' injury was not redressable because the relief it sought—securing a timber lease in the protected area—was too speculative and remote even if the timber company prevailed on its Establishment Clause claim against the Forest Service. Even if it lost the case on the merits, the Forest Service would still have had complete discretion on whether to offer timber leases in the area at issue. Even if leasing opportunities were offered, Wyoming Sawmills would need to qualify for and apply to receive one, and then the company might be competing with others for the lease. Finally, the Forest Service would need to select the company from among the lease applicants.

*Wyoming Sawmills* is sufficiently different from this case that it supports standing redressability here by comparison. Hugo holds Oklahoma water permits. Hugo and

22

Irving have entered a contract for Irving to use Hugo's water in Texas. Hugo has applied to the OWRB for approval to implement the contract. Irving alleges that the Oklahoma water laws on out-of-state water use block performance of the contract. With or without Hugo, a successful dormant Commerce Clause challenge would redress this problem by removing a major state statutory obstacle to securing Irving's contractual water rights through Hugo's application.

Irving's situation resembles the plaintiff's in *City of Altus v. Carr*, 255 F. Supp. 828 (W.D. Tex. 1966). In that case, the district court reached the merits of an Oklahoma municipality's claim that a Texas law banning the export of Texas water to Oklahoma violated the dormant Commerce Clause. *Id.* at 837-40. Altus had contracted to purchase the water from a private landowner in Texas. *Id.* at 831. Irving contracted with an Oklahoma municipality rather than a private landowner, but that difference does not diminish *Altus* as supporting Irving's Article III standing. Irving, like Altus, has contracted to use water out-of-state and is burdened from doing so by allegedly unconstitutional statutes.

Because invalidation of the Oklahoma statutes under the dormant Commerce Clause would redress Irving's alleged injury, I would hold that Irving, like Hugo, has standing to raise its dormant Commerce Clause claim.